THE AMERICAN SEAMEN'S FRIEND SOCIETY and others, Appellants, *v.* HESTER HOPPER and others, Respondents.

*It seems* that, on questions of testamentary capacity, courts should be careful not to confound perverse opinions and unreasonable prejudices with mental alienation.

The true test of insanity affecting testamentary capacity, &c., aside from cases of dementia, or loss of mind and intellect, is mental delusion.

A person, persistently believing supposed facts, which have no real existence, against all evidence and probability, and conducting himself upon the assumption of their existence, is, so far as such facts are concerned, under an insane delusion.

If a testator at the time of making his will is laboring under any such delusion in respect to those who would naturally have been the objects of his testamentary bounty, and the court can see that the dispository provisions were or might have been caused or affected by such delusion, such instrument is not to be deemed to be his will.

The costs of the appeal may be charged upon the proponent of an alleged testamentary paper, where the court are of opinion that he has conducted improperly in the premises.

THIS is an appeal from a judgment of the Supreme Court, affirming a determination of the surrogate of the county of New York, which refused to admit to probate a paper propounded as the last will and testament of Charles Hopper, deceased. The alleged will bore date the 28th of October, 1861, and the deceased died on the first day of November, four days afterwards. The paper was propounded by Chauncey Shaffer, one of the two persons named in it as executors, on the 6th day of the same month of November. A citation was issued to the widow and next of kin, who appeared by proctors and counsel, on the return day, the 26th of December; and on that and several other days prior to the 11th of March, 1864, the proofs were taken, and the parties fully heard; and on the last mentioned day, the surrogate made an order or decree, declaring Charles Hopper, the alleged testator, incompetent to make a will, and that the paper propounded was not executed and attested in the manner prescribed by law, and hence that he died intestate.

The appeal to the Supreme Court was by the residuary

devisees, the American Seamen's Friend Society, and the Ladies' Union Aid Society of the Methodist Episcopal Church of the city of New York, and by Chauncey Shaffer, one of the persons named as executors.

The order of the Supreme Court, affirming the decree of the surrogate, was made on the 1st day of May, 1865. The same parties who had appealed to the Supreme Court then brought the present appeal, making the parties who had contested the probate before the surrogate, parties respondent.

*A. W. Bradford* and *B. J. Blankman,* for the appellants.

*J. T. Brady,* for the respondents.

DENIO, Ch. J.   Charles Hopper, the validity of whose alleged will is the subject of controversy on this appeal, died at his residence in Mott street, in the city of New York, on the 1st day of November, 1861, at the age of about sixty-seven years.  He had no descendants living, but he left surviving him his widow, Hester, and a sister, Elizabeth Wiley, a widow, and six nephews and a neice, the children of a deceased brother, Thomas Hopper.  Besides these, he left other relatives, not entitled to succeed to his estate upon intestacy, namely, three sons and a daughter of his sister Elizabeth Wiley, and a grandnephew, a grandson of his said sister.  The widow of the deceased brother was also living. These relatives, for the most part, resided in the city of New York or in Brooklyn, though three of the nephews and the grandnephew lived in other States of the Union.  He left an estate, the greater part of which was in buildings and lots in the cities of New York and Brooklyn, valued at between eighty and one hundred thousand dollars.  By his will, executed when he was very ill, four days before his death, he appointed Chauncey Shaffer, a counselor-at-law, and Abraham M. Fanning, a real estate agent, his executors; and he constituted them trustees of all his estate not specifically devised.  He gave to his wife (in addition to her dower), besides his beds, bedding, and household furniture and her

clothing, a house and lot in Brooklyn, on condition that she should release her dower in another house and lot in New York, which, in the subsequent part of his will, he devised to his nephew John R. Hopper and Mary Hopper his wife; but if she should elect to receive the rents of the house in Brooklyn and an annuity of $1,400 per annum, both for life, in lieu of dower in all his estate, he gave her the option to do so. He gave to Mrs. Colton, a married neice, the daughter of his sister, Mrs. Wiley, and her children, one dollar each; to the grandnephew, Charles Wiley, living at Janesville, Wisconsin, $300 per annum, until he should come of age, for his support and education. He devised to his said nephew, John R. Hopper and Mary his wife, a house and lot situated on the 10th avenue in New York, in fee, and to each of their children who should be living at his death, $100 each; "to each and every of the children of my brother and sisters living at the time of my decease, and who are not hereinbefore provided for, the sum of one dollar each, whether the parents of said children be living or dead at the time of my decease"; to Mary Russell, his nurse, the sum of two hundred dollars. All the residue of his property, real and personal, he bequeathed and devised to his executors, or to the one who should qualify, in trust as to the personal, to convert it into money, with all reasonable dispatch, and as to the real, to sell it within a reasonable time after the expiration of the existing leases upon it, and to divide the proceeds equally between the two charitable societies above mentioned as appellants; in the case of the Seamen's Society, to be applied to the benefit of shipwrecked and other destitute seamen, and in the other case, to the comfortable residence, support, employment, medical and other necessary cares of aged and infirm females.

Charles Hopper was either a native of the city of New York, or came there at an early age, and commenced life as a butcher in the Franklin market, which business he pursued for many years, and until he had accumulated a considerable estate; but he retired from business several years before his death, and thereafter had no employment except the manage-

ment of his property. He had but little education; and he was quite illiterate, as is apparent from all the testimony and some specimens of his writing which were given in evidence. In early life he married the wife who survived him, with whom he lived on ordinarily amicable terms, down to about five or six years before his death. They had one child, a daughter, who lived to be married, but who died, without leaving issue, before his troubles with his wife and relations appear to have commenced. As to his character, disposition and habits, prior to the change in them which it is alleged occurred, the evidence shows that he was an active and energetic man of business, fond of gain and laboring hard to acquire property, and investing it with reasonable judgment and discretion. He was brusque in his address, positive, willful and headstrong in his purposes and opinions, and impatient of contradiction. He was coarse and profane in his conversation, and much addicted to the use of ardent spirits, though he was not often, until the latter part of his life, so far intoxicated as to affect his capacity for business. If his declarations may be trusted, he was a disbeliever in revealed religion; and he had taken up a very strong prejudice against ministers and clergymen of all religious denominations — believing, or pretending to believe, that they embraced the profession for selfish purposes, and employed it for base ends, especially in regard to the female members of their congregations. I do not mean to say that all these disagreeable traits in his character were proved by any one witness, or are shown to have been manifested at all times; but they are the fair result of all the voluminous testimony in the case. Prior to the year 1855 or 1856, there is no pretense that he was not fully competent to make a testamentary disposition of his property. Even after that period, and down to the time of his death, whenever his state of health enabled him to be abroad, he continued to attend to the making of small purchases for the family use; and it was not usually apparent to those who dealt with him in such matters, that his mind was otherwise than entirely sane. During this period, the business of collecting his rents and investing his moneys was

committed to persons employed as agents by him, and under his directions. It appears that about the year 1856, or somewhat earlier, he commenced to have apprehensions of his wife and his relatives, and suspected them of a design to break up his family — exhibiting on those subjects a good deal of excitement, and talking about them constantly. According to the testimony of Mr. Van Antwerp, a lawyer, who was a good deal employed by him in his legal business, and was, with his partner, for several years his only counsel, this disposition of mind continued to increase, getting, as he expressed it, worse and worse, and more excited, all the time; and he was constantly making new allegations against several persons of a conspiracy to cause his death. In the summer of 1859, he was arrested by policemen, by order of the mayor, charged with threatening to assault his wife; and he gave bail to keep the peace for six months, Mr. Van Antwerp being his surety. About this time his wife left his house, alleging that he had committed violence upon her person; and she soon afterwards commenced an action for a separation, on the allegation of threats of cruel treatment, which made it, as she alleged, unsafe for her to live with him. They lived separate ever afterwards. She appears to have had no kindred of her own blood, and no family connections, except the relations of her husband. Two of his nephews, John R. Hopper and Captain William L. Wiley, took part with her, and gave her some assistance in the legal proceedings; and the sympathy of all the others seems to have been in the same direction. This caused a high state of indignation on his part; and from this time until his death he believed, or affected to believe, that they were conspiring together, and with other persons, to destroy his domestic happiness, and in some secret manner to take his life.

The question which arises upon the evidence is this: Whether his conduct and declarations, from the commencement of the suit for a separation, embracing, perhaps, a year or two prior to that period, down to his decease, were simply the manifestations of an excitable, coarse, ill-regulated and suspicious mind, made more intense by his habits of intem-

perance, or were the consequences, on the other hand, of an insane delusion, which led him to regard as certain truths, and actually to believe in the existence, on the part of his wife and his relatives, of conduct and intentions substantially such as he imputed to them. I am perfectly satisfied that there was no foundation in fact for the gross imputations upon his wife, or the charge against his relatives, all or any of them, of a design upon his life, or an intention to do him any bodily injury; and that the idea of a conspiracy to injure him, otherwise than by promoting the suit which his wife was prosecuting, was either feigned or purely imaginary. If feigned, it is not enough to defeat the will. If he did not really believe what he alleged to be their criminal conduct and intentions—if he uttered the injurious imputations by way of personal abuse, in order to gratify a depraved and malicious disposition, or for the purpose of defaming or otherwise injuring them in the estimation of their acquaintances and the community, any or all of these dispositions and motives, though most unworthy and reprehensible, would fall short of that degree of mental perversion which would enable the courts to pronounce him *non compos mentis* and incapable of disposing of his property by will. On questions of testamentary capacity, courts should be careful not to confound perverse opinions and unreasonable prejudices with mental alienation. These qualities of mind may exist, even in a high degree, and yet, so far as regards the view which the law takes of the case, the subject may be sane and competent to perform a legal act, and be held responsible for crime. Setting aside cases of dementia, or loss of mind and intellect, the true test of insanity is mental delusion. If a person persistently believes supposed facts, which have no real existence except in his perverted imagination, and against all evidence and probability, and conducts himself, however logically, upon the assumption of their existence, he is, so far as they are concerned, under a morbid delusion; and delusion in that sense is insanity. Such a person is essentially mad or insane on those subjects, though on other subjects he may reason, act and speak like a sensible man. (*Dew* v. *Clark*, 3 Add.

Ecc. R., 79.)   If the deceased in the present case was uncon-
sciously laboring under a delusion, as thus defined, in respect
to his wife and his family connections, who would naturally
have been the objects of his testamentary bounty when he
executed his will or when he dictated it (if he did dictate it),
and the court can see that its dispository provisions were or
might have been caused or affected by the delusion, the
instrument is not his will, and cannot be supported as such
in a court of justice.   The conduct and designs which he
imputed to his wife and relations were such as, upon the
assumption of their existence, should have justly excluded
them from all share in the succession to his estate.

I have examined with great attention the mass of evidence
in this case, not with a view of determining whether the
imputations were true, for of that, as I have said, there is no
evidence or probability, but for the purpose of satisfying
myself whether the deceased really believed them, or threw
them out for purposes of abuse, and to gratify revengeful
feelings arising out of the prosecution of the suit for a sepa-
ration or otherwise ; and I will premise that I have not, upon
this branch of the case, relied upon any part of the testi-
mony in respect to which the evidence is contradictory, or
upon the uncorroborated deposition of any witness against
whom there seems any just ground of imputing partiality or
interested motives.

Mr. Van Antwerp, before referred to, is wholly uncon-
nected with the parties to the controversy.   He had been
the attorney and legal adviser of the deceased from the year
1846 down to April, 1860, about a year and a half before he
died.   He appears to be a gentleman of observation and good
sense ; and his profession would lead him to speak with more
precision and intelligence than several of the witnesses who
were examined.   According to his testimony, the excitement
of the deceased respecting his domestic affairs appears to
have commenced about the beginning of 1856, and during
the ensuing three years and a half the witness thinks he con-
versed with him on these subjects as many as an hundred
and fifty times, he continually making new allegations of

circumstances and of the acts of parties, confirmatory, in his opinion, of his suspicions. At first it seems that the allegations were that the suspected parties were interfering with his domestic affairs, and attempting to break up his. family. In the year 1858 he began to entertain the idea that persons were attempting or conspiring to take his life. On one occasion he confidentially informed the witness that the suspected parties had chartered a steamboat on the pretense of going on a fishing expedition, and had induced him to accompany them, and that after he got on board he discovered that their design was to make way with him for the purpose of getting his property. On another occasion, about the same time, he sought a private interview with the witness in the back room of his office, and informed him that there were parties who had procured a carriage and some men, and had driven into the neighborhood of his house, with a design to seize and take him to the lunatic asylum. He said he had got the information from an individual whom he refused to name, because, as he said, he feared that if he did they would kill him. He declared that he would not venture to go home that afternoon, but would go over to Hoboken and return in the night. There is no evidence or reason to believe that any such design was entertained by any person. On the occasion of his being brought before the mayor on a complaint of his wife, he was very anxious that Mr. Van Antwerp should cause the proceedings to be published in the newspapers, for the reason, as he stated, that the suspected parties would get frightened, and he would thus " get rid of the whole tribe." After he had been sued by his wife for a separation, he insisted that a suit should be commenced by him against her on the ground of adultery on her part. On being required to name the other party to the criminal intercourse, he mentioned the names of several prominent clergymen of the Reformed Dutch Church, she being an attendant of one of these churches, and said they were around his house all the time. On the witness declining to commence a suit, he proposed to him to procure his wife to confess her guilt, and agreed to pay him for that service whatever he had a

mind to ask, and said he would give his wife as much money as she wanted to enable her to live like a lady all the remainder of her life.

. Mr. James, the partner of the last mentioned witness, and who seems well qualified to give trustworthy evidence, deposed to several conversations between the deceased and himself, independently of those mentioned by Mr. Van Antwerp. He says the deceased would often come to his office and mention having met individuals in the street, who stopped him and spoke to him; and he said he knew they had a design in doing it, which was to entrap him in regard to his wife's suit. This witness says that the deceased was impressed with a notion, which he never got over, that there was a conspiracy on the part of his wife and several clergymen of the city of New York to break up his marital connection with her; and that these clergymen were in the constant habit of illicit intercourse with her, and that she had been diseased by one or more of them, and had communicated the disorder to him. The witness endeavored to convince him of the absurdity of his accusation, by stating that the clergymen named were men advanced in years, and of high character, and that his wife was also old. But his efforts were without success. The deceased appears to have taken up the idea, pending the suit for a separation, that there was an apartment in Broadway, distinguished by a sign on which a human eye was painted, which was visited by his wife for the purpose of illicit intercourse with the persons whom he had mentioned. When the examination of witnesses in the suit for a separation took place, he insisted that a Miss Warner, who had lived in the family, and who had been examined on behalf of his wife, should be cross-examined about that place which he said he had seen her enter. It does not appear whether the cross-examination embraced that topic, but it was foreign to the issue and probably was not pursued. He constantly expressed to this witness his idea that there was a conspiracy among his friends and family relatives to kill him or get him into prison.

It would be tedious to refer particularly even to the prin-

cipal witnesses who testify to his declarations respecting the alleged infidelity of his wife, and the supposed conspiracy to assassinate him. They are quite numerous, and their testimony shows that his mind was constantly occupied with those apprehensions to the exclusion of almost every other subject. But I ought not to omit the testimony of Dr. Downs, on account of his profession and the superior opportunities which he possessed for observing the deceased, and his connection with the execution of the will, to which he was one of the attesting witnesses. Dr. Downs is a physician, practicing in the city of New York, and had been the medical attendant of the deceased for the last year of his life. The deceased had been much ill during that time, the doctor having visited him professionally, as he states, about eighty times previously to the injury which occurred about a week before his death. I limit my notice of his deposition to the two topics: the infidelity of his wife, and the alleged conspiracy to take his life. The deceased stated to the doctor, at about the commencement of his attendance, that he had pains in his bones, limbs and head, and ulcers and sores upon him; that these were produced through his wife, and were the result of disease arising from her intercourse with other men. He mentioned the names of three well known and respected ministers of the Dutch Church, as parties with whom the intercourse had taken place, and stated that one of them had been detected in going over a fence to get away from his house. He affirmed that he had proof that she went to houses of assignation, and that the woman who lived with him, and was the person who had been examined in the suit for a separation, had knowledge of her infidelity, and that he had offered her money to tell all she knew. The doctor swore that the deceased appeared to believe these imputations respecting his wife.

On the subject of the conspiracy, the deceased, according to the testimony of this witness, alleged that all his relatives were set against him, and were endeavoring to kill him by the administering of chloroform, or some other means, in order to get his money, which he said amounted to about

$100,000. He included in these charges all of his family relatives, and was particularly suspicious of two of his nephews, John R. Hopper and Captain Wiley. He pretended to have been under the influence of chloroform through their procurement several times ; and to have been once knocked down in the street by some one of the party ; and whenever any trifling accident happened to him, such as falling, he would attribute it to the influence of chloroform administered by the agency of some of them. These declarations he says were repeated constantly, and though he would sometimes apparently convince him of their absurdity, he would renew them until the doctor desisted from all conversation with him on the subject. The doctor declared on his oath that he considered him a monomaniac in respect to his family and relatives. It is doubtless some detraction from the value of the doctor's testimony that he countenanced the execution of the will by becoming an attesting witness, though he declares that he informed persons beforehand that he did not suppose the instrument could be sustained. But considering the apparent candor of his answers, and the amount of corroboration, I am induced to believe in the substantial accuracy of his statements.

A great number of witnesses, in addition to those already mentioned, relate declarations and conversations of the deceased, on a great variety of occasions, to the same general effect as those stated. It appears to have been the principal topic of his conversation, for a year or two before his death, that he was habitually pursued by a combination of persons, embracing all his relatives, whose design was to effect his death by chloroform or by violence, and that his wife was continually engaged in illicit amours at assignation houses and other places. He repeatedly made offers of money to persons totally unconnected with his family, but whom he suspected of some knowledge of the conspiracy, if they would come out and expose the conspirators. One of these witnesses, the nephew, John R. Hopper, gives testimony covering the whole ground ; but as he cannot be considered indifferent, from being a party to the litigation, and on account of diffi-

culties with the deceased and with Mr. Shaffer, who drew up and has propounded the will, I do not refer particularly to any part of his deposition, except that which relates to the pretended place of assignation frequented by his wife; and I mention this only on account of a slight incidental corroboration existing in the handwriting of the deceased himself. Mr. Hopper swears that the deceased very often referred to the sign of a human eye in front of an oculist's office in Broadway, between Bleecker and Houston streets, as the place of assignation. The deposition proceeds as follows: "He stated that this eye was used to direct his wife as to what time it would be safe for her to come out of the house — her and Mary Ann Warner; and when she ought to stay in the house; that sometimes the sign would be on the right side of the door, and sometimes on the left," &c. Several of the others speak of his statements respecting this sign, intimating that it designated a place where his wife was accustomed to meet persons with whom she had criminal intercourse. In a book containing entries in the handwriting of the deceased, in the form of a diary, but very illiterate and incoherent in its general terms, there is found this minute: "1857, Feb.— After the ign of the human eye was taken *down and put on left side of the door, some days after remove all together*, the day that Mrs. Shipman was at my house, and James Demarest and wife, and her sister and Mrs. Reid, called on Mrs. Williams of Bangor, for to tell about the sign." The entry apparently refers to the employment of the sign as a signal, and shows that his mind was early exercised upon it and its removal from one side of the door to the other, apparently as a signal for some persons. Standing alone, it would of course have little or no weight, but connected with the other testimony, it has some tendency to show how strong the delusion was upon that particular subject. In referring to the evidence on the part of the contestants, I have omitted a great deal which is related by them showing the folly, fatuity and incoherence manifested by the deceased upon various occasions and upon different subjects. They afford some ground for imputing to the deceased general insanity. But as he was an habitual

drinker, and was frequently intoxicated, it is impossible to say whether what is deposed to was the result of temporary intoxication or of settled mania. I have, therefore, in coming to a conclusion, relied wholly upon the proof of delusion upon the two subjects intimately connected with the testamentary disposition of his property.

The party propounding the will has examined a great number of witnesses, many of whom knew the deceased but slightly, and who speak of trifling transactions of business, such as purchases of provisions and articles of family market-ing. This class of witnesses, when they found him able to transact such affairs, and saw nothing extravagant or pecu-liar in his manner, readily pronounce him of sane mind. In cases involving questions of mental capacity, I have gen-erally found opinions of unprofessional witnesses, with only a short or slight acquaintance with the party, of little value. If the witnesses, though not professional, have had a long and intimate acquaintance with the person of whom they are called upon to speak, and are, moreover, persons of intelli-gence, and detail the facts upon which their opinions are founded, the testimony is often extremely useful. Where the mental disorder is a delusion upon one or a few particu-lar subjects, the testimony of persons with whom he has not had occasion to speak on those subjects is of no weight. The considerable number of shop-keepers, mechanics and retail dealers who have been called upon to pronounce upon his capacity, have not appeared to me to overcome in any appre-ciable degree the testimony on the other side which I have adverted to. It is worthy of remark, however, that several of the persons who have been examined by the proponent, and who have given opinions favorable to his capacity, have, on cross-examination, remembered declarations of the deceased strongly confirmatory of the evidence of delusion produced by the contesting parties.

The symptoms of delusion upon the two subjects so often adverted to, appear to have continued in their full force down to the time of the injury by being burned, which the deceased received on the 20th of October, about a fortnight

before his death. This injury reduced his strength, and diminished the violence of his language to some extent; and it was during this period of debility that the will was executed; but I am unable to find any evidence that the delusions under which he had been laboring were dispelled. Dr. Downs, who had the best opportunity of observing, states that he had held the same language in substance respecting his family, but that he was less violent and demonstrative in his expressions, owing, as the doctor supposes, to his debility.

The will makes a certain provision for his wife, though much less than we should look for, considering the amount of his property and that he left no descendants, if he had not taken up the insane and absurd belief that in her old age she had been constantly violating her marriage vows. He also makes a certain provision for John R. Hopper, one of the nephews, and the one against whom he entertained the most violent animosity, and whom he sometimes charged with inflicting the injury which hastened his death, and his children; but he gave nothing to his widowed sister, and only the nominal sum of one dollar each to her children and to his other nephews and nieces; and he bestows the bulk of his estate to two charitable societies, meritorious, no doubt, but which, it is apparent from his general modes of thinking, he would never have conceived the idea of endowing, if he had not determined to disinherit the natural objects of his bounty, from an insane belief that they had long been conspiring against his happiness and his life.

I have omitted to speak of many subjects which were much litigated in the evidence and enlarged upon in the argument. They relate for the most part to immaterial issues, though they occupy a large space in the two volumes of testimony which have been laid before us. The effort to charge John R. Hopper with the attempt to assassinate the deceased by laying him upon a hot stove, and thus causing an injury which no doubt hastened his end, I dispose of by saying, that it is without evidence and against all rational probability, and is disproved by the evidence of the contestants. Besides, this same person is more favorably considered

in the will than any other of his relatives; and furthermore, the determination of the deceased to disinherit his relatives, according to the testimony on the part of the contestants, was formed long before the happening of the injury. The same remark may be made respecting the difficulty which is said to have occurred between him and Capt. Wiley. He was cut off, not so much on account of any personal objection to him individually, for he was placed in the same category with his brothers and sister, but as a part of the determination by which the family were deprived of the succession, on account of their conspiring against him. I regard the allegation of an insane delusion on the part of the deceased on the subjects so often referred to, as satisfactorily established by the testimony; and, if the determination of the case belonged solely to me, I should, without hesitation, pronounce against the will.

I have thus far assumed the execution of the instrument to have been satisfactorily established. The deceased is shown to have assented to the provisions of the will as it was read over to him by Mr. Shaffer in the presence of the two physicians who became attesting witnesses, and of Mr. Fanning, and to have assented to the publication of it as his will, and to have assented to the request to the witnesses to subscribe it; and he took hold of the pen when Dr. Downs wrote his name at the end of the instrument. It is a little uncertain, however, from the evidence, whether his assent was by a nod or gesture, or by words; but if by words, they were limited to simple affirmative answers to questions put by Mr. Shaffer. I do not doubt but that a will may be legally executed in this manner. But the evidence ought to be satisfactory that the testator was capable of understanding what was proposed to him. Now, according to the testimony of Dr. Vanderpoel, the deceased was then in extremity. He was separated from every member of his family, and no attempt was made to put him in communication with any of them. He had none of the attention or any of the comforts which a man of large pecuniary means and with a numerous kindred could easily have commanded, if he had

been properly dealt by. The nurse, if she could be so called, was a woman who was habitually intemperate and often drunk, and otherwise extremely vicious. Dr. Vanderpoel swears that he thought him the most God-forsaken man he ever saw, and the other evidence fully bears him out.

The evidence which relates to the precise time of execution, is adverse to the validity of the will. The two attesting witnesses, Doctors Downs and Vanderpoel, and Messrs. Fanning and Shaffer, were present. Of these, Dr. Downs and Mr. Fanning thought him incompetent to understand and execute such an instrument. The former, it will be remembered, had been his attending physician for more than a year, and Mr. Fanning had been his agent for collecting his rents for a longer period, and both had been in constant, and, for a considerable part of the time, in daily intercourse with him. Dr. Vanderpoel saw him for the first time when he came to witness the will, and though he attended him, in consultation with Dr. Downs from that time until his death, he had not at any time any conversation with him except to ask such questions as professional duty required, and to receive answers in mono-syllables. He frankly admits that sufficient did not occur in his presence to enable him to form an affirmative opinion as to his competency; but he says that he neither saw nor heard anything to enable him to give any other opinion than that he was sane. Mr. Shaffer is understood to affirm that he was competent; and there is no doubt that his opportunities of observation were ample. The weight of evidence, if the case depended on that interview, would be against the testamentary capacity of the decedent.

The will was drawn on the same day by Mr. Shaffer; and if the testimony of Mr. Fanning is to be believed, and I am inclined to credit it, there were no intelligible instructions given. On the morning of the day on which it was executed, there was an interview between the deceased and Mr. Shaffer and Mr. Fanning, around the sick-bed of the former. The final instructions, if there were any, were given on that occasion. Mr. Shaffer would ask the questions, and the deceased was understood generally to have assented to what was pro-

posed, but in a manner, according to Mr. Fanning, not denoting any intelligent appreciation of what was going forward. For instance, the question was asked, what should be given to John Hopper. The deceased replied, give him all. The witness says, " Other names were asked, but Mr. Hopper (deceased) could not and did not give a name." He says that Mary Russell, the nurse, who was present, gave a number of the names — of his relatives, as I understand. After some other propositions, to which the deceased assented, it was asked what should be given to this Mary Russell, the nurse, and the reply of the deceased was, " Give it all to her; she may as well have it as anybody." At the close of this conversation, the parties separated, and the will was drawn at the office of Mr. Shaffer at a later period of the day, and executed in the evening — Mr. Fanning being present when the principal provisions were settled upon. I am aware that Mr. Fanning is contradicted in a good deal he has sworn to by Mr. Shaffer; and it may not be an easy matter to determine which version to credit. Fanning, having refused the executorship, has no possible interest in the result. Mr. Shaffer, if the will is sustained, becomes the devisee in trust of this considerable estate, with no person to call him to account except the charitable institutions, which, under the circumstances, would not be likely to be very exacting beneficiaries. It would be apparent to them that they owed the gift to Shaffer's agency, and his wife was a manager of one of them. That he entertained the idea of profit from the position, is admitted by himself; and it is not difficult to see that the management of such an estate by an attorney, for a course of years, would yield something of an income. He may be regarded, I think, as taking a substantial benefit under the will. Considering the condition of extreme debility of the deceased, I think some corroborative evidence of instructions, beyond the deposition of Mr. Shaffer, ought to have been given. Reading a will to a testator in the presence of the witnesses is usually enough, even where it has been drawn by a party who takes an interest under it; but this supposes that the testator has capacity to understand it. I am not at

all satisfied that the deceased was in such a condition. To say the least, it was a case of doubtful capacity. Seeing that, at an interview in which instructions were professed to be received on the same day the will was drawn, there was not one word said respecting the principal legatees, and that the deceased was *in extremis* when the formal execution took place, I am obliged to say that there should have been further evidence of directions to prepare a will disinheriting the greater part of his relatives and giving the bulk of his estate to these corporate legatees. The deceased may have conversed with Mr. Shaffer about giving it in that manner, on former occasions, though Mr. Fanning supposes that, as to one of the societies, the gift was suggested by himself while the will was being drawn, and after the interview when the final instructions were given. Upon the whole, the evidence is not satisfactory to my mind that the deceased really dictated the substance of this will, even supposing that, with proper assistance, he was competent to make a will.

I have alluded to the isolated and miserable condition in which he was found when the will was executed. This was no doubt owing, in a great measure, to his own perversity, and his unreasonable suspicions. But I am not satisfied that he was dealt by with perfect fairness by his confidential adviser. It seems to me that one who had won his confidence could and should, when he found him dying under such circum stances, have brought him in communication with those members of his family against whom he did not pretend to have any cause of offense, beyond the morbid suspicion, wholly groundless, as must have been known to be, that they were concerned in some plot against his life. Yet I do not find that Mr. Shaffer ever made any endeavor in that direction. On the contrary, he expressly testifies that he never reasoned or remonstrated with him upon the absurdity of his suspicions. But he went further than that. He encouraged his delusions by countenancing the idea that there had been attempts to poison him, and a " plot " against his domestic peace in which members of his family were engaged. I think that after it was seen that he was dying from an acci-

dental injury, it was the duty of one standing in such a relation to him as Mr. Shaffer did, to endeavor, at least, to put him in communication with those who had a natural right to protect him, and to see that any testamentary dispositions which he might be disposed to make were the voluntary dictates of his own will.

I am in favor of affirming the judgment of the Supreme Court, and of charging the costs of this appeal upon the proponent of the alleged testamentary paper.

BROWN, J.   The instrument, which is the subject of this litigation, was executed under quite unusual circumstances, and such as suggest grave doubts whether it in reality expresses the will of Charles Hopper, the decedent.   He was at the time greatly enfeebled by vicious habits and by the accident which, in a few days thereafter, led to his death. He was raised up in his bed and his hand guided while he signed his name, and he signified that he understood its contents, and declared it to be his will and his wish that the witnesses should subscribe their names as such by brief responses to questions put to him by the counsel who prepared it, barely sufficient to convey his assent and request for those purposes, or, as the other witnesses said, by nodding his head and assenting.   He was unattended by his family or any of his relatives, or, indeed, by any person possessing his confidence, except it might be Chauncey Shaffer, who says he prepared the paper under the decedent's direction. There were four persons present: Chauncey Shaffer and Abraham Fanning, who are named as executors, and Dr. Downes, his attending physician, and Dr. Vanderpoel, called in by Shaffer expressly to witness the execution of the will. It was well known to the three first named persons that Hopper's conduct had long been such as made him an object of suspicion to his neighbors and acquaintances — suspicion that his mind was disordered, and that on some particular subjects he was a monomaniac, laboring under the grossest delusion.   No inquiry or examination was made, however, into the state of his mind at the time for the purpose of

ascertaining his testamentary capacity. Mr. Fanning and Dr. Downes testified before the surrogate that they regarded him insane at the time. Chauncey Shaffer gave it as his opinion that he was of sound mind, while Dr. Vanderpoel saw nothing indicating mental derangement, and adds, "his opportunities of learning much about Hopper were very few, very small, very limited"—had little or no conversation with him because he only answered in. monosyllables. This is a brief summary of what occurred and the opinions of those present when the proposed will was executed. Their significance upon the question of capacity will be more apparent when we see what was the character and habits of Charles Hopper, and the particular delusion under which it was thought he was laboring for some years before his death.

Charles Hopper was a butcher by trade, in which it is said he had made a fortune of some $100,000. He had withdrawn from his business for some years before the making of the proposed will, and was living without business or employment of any kind. He had lost his only child, a daughter, some time before the year 1857, and up to that time lived in harmony with his wife, Hester Hopper, and his other relatives. He appears, from the evidence, to have been a man of violent, vindictive and suspicious temper, easily excited and irritated. He withal became very intemperate, addicted habitually to the excessive use of intoxicating liquors. He had no sympathies with any of his kind; had no religious sentiments, and no respect for those who had. His household consisted of a drunken woman, Mary Russell, with the aid of a male servant occasionally to look after him. Dr. Vanderpoel describes him as the most God-forsaken man he ever saw. A controversy arose between himself and his wife, which terminated in a decree for a limited divorce at her suit, with a considerable allowance for her support and maintenance during the separation. It was during the pendency of this action that he became acquainted with Chauncey Shaffer, whom he retained as his counsel therein. He then began to exhibit decided symptoms of the delusion or monomania which is thought to have obscured and perverted his

intellect up to the time of his death. This consisted in the belief, openly and constantly asserted, that his wife had been guilty of. conjugal infidelity with numerous clergymen of respectable character in the city, going so far at times as to name the place of assignation where the intercourse occurred. He also entertained and asserted the belief that his wife and other relatives had entered into a conspiracy to effect his death, in order to appropriate his property to their use. Sometimes he thought his death was to be effected by chloroform, and by throwing him into the sea while on a fishing party. At other times he asserted they were about to imprison him in a lunatic asylum, and actually asserted at one time the carriage was at his door to remove him to the asylum, and asked the servant to keep a look-out for the carriage. All this was the creation of his own disordered mind. The most intense hatred to his wife and other relatives was the consequence of this delusion, accompanied with repeated declarations that they should not inherit or succeed to his property. A remarkable instance of the predominance of this delusion occurred near the close of his life, and about the time the proposed will was executed. On the 19th of October, 1861, twelve days before his death, and nine days before the date of the instrument, he was found, by the man employed to watch him, attracted by his cries and moans, lying across the stove, in which fire was burning, and upon which he had apparently fallen, and from which he had not strength to remove himself. He was rescued from the stove, placed upon his bed, and found to be severely and extensively burned upon the body. From this injury he never rallied or recovered. He immediately conceived the idea that his nephew, John R. Hopper, who had been his agent some time before, had attempted to murder him, and had thrown him upon the burning stove to that end. This accusation he repeated and persisted in, so that the proponents were placed in the position of accepting this unequivocal manifestation of mental derangement or to attempt to prove the truth of it by evidence before the surrogate. This effort was made, and entirely failed. The testimony of Charles

Groun, who slept in the room with Charles Hopper (the doors being fastened), and that of John R. Hopper, showed that the charge was entirely without foundation in fact, and proceeded alone from Charles Hopper's disordered imagination. The idea that a person would attempt to commit murder in that way was too incredible for human belief.

The will proposed makes small provision for his wife, upon condition that she releases her right of dower in his real property, and then devises a house and lot in the 10th avenue, New York, to John R. Hopper and his wife. It also makes some insignificant bequests to some of his relatives. The bulk of the estate is given to his two executors, Fanning and Shaffer, with the power of management and sale and conversion into money, when the proceeds are to be divided between the two charitable societies named, for the uses thereof. If a careful examination of the evidence taken before the surrogate results in showing that Charles Hopper, upon some subjects, and indeed generally, had mind and memory and sense sufficient to know and comprehend ordinary transactions, still it will also result that upon the subject of his wife and his other relatives, those who would naturally have been the objects of his care and bounty, and who would have succeeded to his estate, he was a maniac, given to the grossest insane delusions. The instrument proposed cannot be regarded as his will, because upon such a subject he was incapable of expressing or forming an intelligent will. It is the result, not of a clear, unclouded intellect, having an intelligent comprehension of the relation of the things with which it proposes to deal, but the result of a delusion which controls the judgment and misleads the understanding in relation to the subjects upon which it is acting. A monomaniac may make a valid will, when its provisions have no connection with the particular delusion, and there is no reason to think they are influenced by it. But when, as in this case, the delusion relates to the persons who would, in the natural and usual course of things, become the objects of the maker's care, solicitude and bounty, and especially upon whom the law would cast the inheritance of his property, the

instrument must be regarded as invalid to pass the estate, because it does not express the will of a testator of sound disposing mind.

There is a great deal of the evidence to which I have not alluded, and to which, on account of its volume, it is almost impossible to allude, with profit. There is evidence upon both sides, of the opinions of witnesses, many of them medical men, some in affirmation of Hopper's sanity, and some declaring his insanity. I do not rely much upon this kind of evidence, when the opinions are unaccompanied by the facts upon which they are founded. Experience shows that even medical men and experts are quite as apt to get astray in their opinions of the sanity of individuals as others. I have, therefore, in forming my judgment in the present case, been influenced by the circumstances to which I have referred, as exhibiting insanity and delusion, rather than relied upon the opinion of witnesses, whatever may have been their position or experience.

I am of opinion that the decree of the surrogate and the Supreme Court, rejecting the will, should be affirmed.

All the judges concurring, except WRIGHT, J., who was absent,

Judgment affirmed.