WARREN NEWTON, as Administrator, etc., of JOSE-PHINE V. ROSS, Deceased, Plaintiff, *v.* THE MUTUAL BENEFIT LIFE INSURANCE COMPANY, Defendant.

*Insanity — evidence as to — Question in application for life insurance, as to diseases — when only those of an hereditary character referred to.*

In an action upon a policy of life insurance, the defendant, in order to show the insanity of the deceased's father, called the superintendent of an insane asylum in Ohio, having no personal knowledge of the disease of the father, who stated that it appeared from the records that he was twice admitted to the asylum.

*Held,* that this evidence was improperly admitted.

A copy from the records of the Probate Court, in Ohio, stating that the court visited Ross (the father), held an inquest, and, on the testimony produced, held him to be a lunatic, was also given in evidence by the defendant. No proof of the authority given to this court by the laws of Ohio was offered.

*Held,* that this evidence was incompetent to show the insanity of the father.

A question in the application was: "Have they (parents, brothers, or sisters) died of, or been afflicted with insanity, epilepsy, * * * or other hereditary disease?"

*Held,* that it was only insanity of an hereditary character that was referred to in the question, and not an accidental or temporary insanity.

Motion for a new trial on a case and exceptions ordered to be heard, in the first instance at the General Term, after a nonsuit directed at the Circuit, and an appeal from an order denying a motion for a new trial, made upon the minutes of the justice before whom the action was tried.

The action was brought upon a life insurance policy, given by the defendant, insuring the life of C. Henry Ross, in the sum of $5,000, and dated the 17th day of January, 1867. The policy was given to Mrs. Josephine V. Ross, wife of said C. Henry Ross, who, through the agency of her husband, made the application there-

for.   The said  C. Henry Ross died from the  effects of laudanum, taken by him on the 15th day of November, 1874.  Proofs of death were furnished to the defendant by the said Josephine  V. Ross to this effect.   Subsequently the said Josephine V. Ross died, and the plaintiff, Warren Newton, was appointed administrator of her estate and commenced this action as such.   It was tried on the 21st day of November, 1876, and the plaintiff was nonsuited. The defense was that Ross had committed suicide; that he died from using intoxicating liquors, in violation of the condition of his policy, and that the answer to certain of the questions in the application for the insurance were false.

*George M. Tillson*, for the plaintiff.

*E. H. Prindle*, for the defendant.

LEARNED, P. J.:

On the question whether the deceased, C. Henry Ross,  "died by his own hand," I think the case should have gone to the jury; principally on the point of his mental condition.

So, on the question (if that was urged by the defendant), whether the deceased died by reason of intemperance.

The remaining points have respect to the answers to questions in the application for insurance.   "Have they (parents, brothers or sisters) died of or been afflicted with insanity, epilepsy, disease of the heart, scrofula or other hereditary disease?"   Answer:  "No." "If not living, at what age, and of  what disease did  they  die?" Answer:  "Father died at about 45 years  from a brain disease caused by a hurt."

The defendant claims that the father of the deceased was afflicted with, and died of  insanity.

The evidence given by the defendant on this point is testimony by a superintendent of the Cleveland Hospital for the Insane in Ohio.   He knew nothing of the disease of Benjamin Ross, father of the deceased, but stated that the record of the books showed that he was twice admitted to that hospital.

I think that evidence improper.   At the most it only established the fact that Benjamin Ross had been admitted to the asylum;  not

that he was insane. Against the plaintiff, the administrator of Josephine V. Ross, it established nothing material to the case.

Other evidence offered by the defendant was a copy of the records of the Probate Court in Ohio. These records simply state that the court visited Benjamin Ross, held an inquest of lunacy, and on the testimony of a respectable physician (naming him), and other testimony held said Ross to be an insane person. No proof was made as to the authority given to this court by the laws of Ohio. It was proved that the laws of Ohio require the papers in such cases to be filed, but no record thereof to be made; only a "journal entry of the finding of the court." Now, admitting that an inquisition of lunacy duly found is *prima facie* evidence, the evidence produced falls short of such an inquisition. An inquisition, as known to our law, is a finding of facts by a jury. (Bouvier's Law Dict.) We cannot assume, without proof, that the laws of a State have dispensed with that safeguard. Nor can we admit that such a mere entry as was produced is evidence in this State of the insanity of a person.

The remaining evidence on this point of insanity is that given by the widow of the deceased, called on behalf of the plaintiff. She testifies that Dr. Ackley said her husband needed quiet and treatment, and under those conditions he went to the asylum; that he was not confined with the patients; that he worked in the bakery and earned money; that he complained of pain in his head; that he had a hurt when a child; that he came out of the asylum and went back there again in the fall, and then came out about Christmas and lived with his wife till he died; that he always recognized her and his children. He seemed to know what was going on clear to the end. Before his death it was said that he had a softening of the brain. On a *post-mortem* examination, it was found that the brain was in a hardened state. When a child he had been hurt in the back of his head by a fall.

Now, on this evidence, it seems to me that at least it was a question for the jury, whether the answer was not true that Benjamin Ross died from a brain disease caused by a hurt. If there was a hardening of the brain, and if that was caused by the fall in childhood, the answer appears to have been true.

Again, looking at the other question, we see that it is " Have

they died of or been afflicted with insanity,    *    *    *    or other hereditary disease." The word hereditary must have some meaning. The question probably is intended to determine whether the insured is likely to have the same disease. If the trouble under which Benjamin Ross suffered came from the fall, I do not see that we can assume that it was hereditary. Indeed, he appears to have suffered rather under an enfeebling of the mind; "seemed like a man who could not think, and he did not seem to have a mind." The widow says he had paroxysms of wildness, and explains her meaning by saying that if anything irritated him, he would be like a stubborn boy.

It is said that the only legal test of insanity is delusion. (*In re Forman's Will*, 54 Barb., 275; *Seaman's Soc.* v. *Hopper*, 33 N. Y., 619.) There is no evidence whatever in regard to Benjamin Ross that he ever suffered under any delusion. I do not think it necessary to enlarge on this point. Probably without the evidence, which, in the view above stated was improperly admitted, it would hardly be claimed that insanity was proved beyond all doubt. There should be a new trial; costs to abide the event.

BOCKES, J., dissenting :

The dismissal of the complaint at the Circuit was ordered undoubtedly on the ground that the assured did not truthfully answer questions propounded to him in his application for insurance. To the usual question, whether any members of his family, parents, brothers or sisters, had died of or been afflicted with insanity, epilepsy, disease of the heart, scrofula, or other hereditary disease, he answered, "no;" and in answer to the question, as to the disease of which his father died, he answered, "from a brain disease caused by a hurt." The case shows that his father had been insane, and twice an inmate of an insane asylum; and that he died insane; and further, that the assured knew of these facts when he made his application for insurance. The negative answer then to the question, whether his father had died of, or been afflicted with insanity, was untrue. In the ordinary understanding of words, his father died of insanity, for he died of a chronic affection of the brain which caused insanity. It was to this fact that this branch of the inquiry was directed. Fevers,

and some other general and some local disturbances of the system, will and often do produce temporary insanity. But a settled disturbance of the mental faculties, continuing for months and years, is quite a different matter. In the former case, that of a fever, for instance; a death occasioned by it would not be a death from insanity, but death from fever. In the latter case, however, a disease of the brain continuing for years, causing periods of insanity and ultimate death, would, according to common understanding, be a death from insanity. When, therefore, the assured answered that his father did not die of insanity, he answered untruly. So, too, when he answered that his father had not been afflicted with insanity, he answered untruly. But it is urged that his insanity was not in his case an hereditary disease, and, therefore, the answer was not untruthful. Now, insanity, epilepsy, disease of the heart, and scrofula, are held to be of the class of diseases known as hereditary, and the question was, did he die of, or had he been afflicted with insanity   *   *   *   or other hereditary disease? The question was not, in its full scope and meaning, did he die of, or had he been afflicted with *hereditary* insanity, but did he die of, or had he been afflicted with insanity or other hereditary disease? The question was answered untruthfully, according to its fair import. It is suggested that the record evidence, that the father of the assured had been adjudged insane, was improperly admitted. It is here unnecessary to consider this point, inasmuch as his insanity was established by other competent and satisfactory evidence. It is also urged by the respondent, that the answer to the effect that the father died of a brain disease " *caused by a hurt* " was untruthful. I confess I am not satisfied with the integrity of this answer under the facts of this case. But its discussion is unnecessary, in view of the conclusion above reached, with reference to other answers. Of course, if the answers above considered were untruthful, the policy was void. Such is the express stipulation contained in the policy itself ; and the cases which bear on this point are too numerous and familiar to require citation. It was also provided in the policy, that in case the assured should " die by his own hand," then that the policy should be void. He did die undoubtedly by his own hand. He swallowed a fatal dose of laudanum, and purposely to produce death. But whether he was entirely

himself, and responsible for the act may be well doubted. Had this been the turning point in the case, it might well be insisted that this was, on all the evidence, a proper question for the jury.

But, in the view above taken of the case, this point is wholly immaterial. I am of the opinion that the dismissal of the complaint was well directed.

Present — LEARNED, P. J., BOCKES and BOARDMAN, JJ.

New trial ordered, costs to abide event.