## In re BERRIEN'S WILL.

*(Surrogate's Court, New York County.   April 27, 1889.)*

WILLS—VALIDITY—TESTAMENTARY CAPACITY.

Testatrix was 83 years old, in feeble health, and partially deaf and blind, when she made her will, which was about 5 weeks before her death.   She had lived for some years with her daughters, the contestants, and had been subjected to restraint by them,—as they alleged, for her own good.   They had refused to permit her to leave the house to visit her son, the proponent, and she finally left by stealth.   She bitterly complained of their treatment of her and violence towards her, and used profane and abusive language about them.   After leaving their house she became much more quiet in her conduct, though she manifested resentment towards them, and said at different times that they should have none of her property, and that she would rather die than to go back to them.   She was naturally self-willed, and of violent temper.   While at proponent's house she executed a power of attorney, giving proponent authority to draw her money at the bank, over the objection of one of the contestants, and she also conveyed to him some real estate.   She dictated the terms of her will, and named proponent as her executor.   The draughtsman and witnesses, one of whom was a physician, considered her rational.   While her signature to the will was defective, her physical weakness and partial blindness would account for that fact.   She gave none of her property to contestants, and none of any value to proponent.   She gave the bulk of her property to proponent's children, and seemed to be impressed with the idea that it was greater than it actually was, though she seemed to know that she had money in the bank.   The provisions of the will were dictated to the scrivener by her in the absence of the interested parties.   One physician of experience in cases of insanity testified in answer to questions based on the hypothesis of her advanced age, physical weakness, profane and obscene language, and acts indicative of her extravagant estimate of the mone-

tary value of services performed for her, as testified to by contestants, that in his
opinion she was laboring under senile dementia. *Held*, that the evidence failed
to show want of testamentary capacity.[1]

Petition by Benjamin G. Berrien, executor of the alleged will of Rachael
Berrien, deceased, to admit the same to probate. It was contested by two
daughters of the deceased, Mrs. Baker and Miss Berrien.

*Cyrus A. Peake*, for proponent.   *Thomas Durant*, for contestants.

RANSOM, S.   Paper offered for probate bequeaths various articles of house-
hold furniture and plate, and a gold watch, the whole being of inconsiderable
value, to her son, the proponent, her grandson, and two daughters, and to
Dr. Darlington, her attending physician, and gives the residue of her prop-
erty to her grandson, Peter B., and her granddaughters, Amanda, Sarah,
Emma, and Ida J. Berrien, in equal shares, and appoints her son, Benjamin
G. Berrien, the executor.   The beneficiaries, except Dr. Darlington, are all
the children of the executor.   Objections to the probate of the instrument
were filed by Mrs. Baker and Miss Maria Berrien, two daughters of the de-
cedent, alleging that the execution was not the decedent's free, unconstrained,
or voluntary act; that she was not of sound mind, memory and understand-
ing; and that it was not properly executed, or, if executed, it was through
the fraud, circumvention, and undue influence of the proponent or other per-
sons unknown.   The paper was executed on the morning of June 19, 1888,
at the residence of the proponent, about five weeks before decedent's death,
which occurred on the 25th day of July following.   She was 83 years of age.
The requirements of the statute were strictly complied with.   The subscrib-
ing witnesses were Mr. Peake, who was the draughtsman of the will, Mr.
Fitch, and Dr. Miles.   The two first named are lawyers.   The evidence shows
that great care was observed to have the instrument properly executed, and
there were substantial reasons therefor.   Shortly after the death of decedent's
husband, in 1884, she went to reside with her daughters, Mrs. Baker and Miss
Berrien, and while there she made a will in their favor.   Subsequently she re-
turned to the house of her son, the proponent, and remained about a year, when
she again went to Mrs. Baker's, and there remained until about the 20th of May,
1888.   During that period the proof shows that she was under restraint at
their hands, for which the daughters claim there was good reason, in view of
her alleged impaired mental and physical condition.   Mrs. Baker admits that
she sometimes had the door fastened, but states that she never prevented the
decedent from leaving her room, except when she had a "wild spell," or when
she was sick and unfit to go; that she was not left alone for more than an
hour at a time; and that when a carriage came for decedent in the fall of 1887,
with decedent's son, the proponent, and his two daughters, she told them that
decedent was too sick, and could not leave.   Mrs. Baker's husband and son,
who were absent during the day most of the time, and Mrs. Flanagan, a
laundress, and Eidman, a peddler, who were occasionally at the house, saw
no evidence of restraint.   But the decedent's son, the proponent, stated that
in the fall of 1887 he received word that she wanted to see him, and he went to
Mr. Baker's house, rang the bell, and Miss Maria Berrien came to the door.
He stated that he wished to see his mother, and Miss Berrien refused him.
He asked where Mrs. Baker was, and was told that she was in the kitchen.
He went around to the kitchen, and Mrs. Baker came and said that he could
not see the decedent; that he was the cause of all the trouble; and she threat-
ened to have him arrested for trespassing if he did not go off.   He saw his
mother jump on a chair, pull a window down, and she called to him, "For

[1] On the general subject of evidence to show testamentary incapacity, see In re Bull,
2 N. Y. Supp. 52, and note; same case on appeal, 19 N. E. Rep. 503, and note; In re
Keeler's Will, 3 N. Y. Supp. 629, and cases cited; Tucker v. Sandidge, (Va.) 8 S. E.
Rep. 650; Kerr v. Lunsford, (W. Va.) Id. 493, and note.

God's sake, go and get an officer and take me away from here." He told her to be quiet, and he would do what he could. Peter B. Berrien, the proponent's son, probably referring to the same occurrence, says that he went with his father to Mrs. Baker's house, and knocked at the door, but got no answer, and when they started to go out of the yard decedent saw them, drew down the top window, and stepped on a chair and asked them—as near as he recollects—to get a policeman, and take her out of there. Then Mrs. Baker came to the window, and said if they did not go away she would have them arrested, and she said to decedent that Mr. Berrien wanted to get her away from there to get her money from her. Tighe, a young man, went with a carriage to Mrs. Baker's house in the fall of 1887, at the request of the proponent, taking with him proponent's two daughters. He states that as soon as decedent saw the carriage she wanted to get out, and Mrs. Baker and Miss Berrien tried to keep her back; that decedent pounded at the door, and made frantic efforts to get out, and once "yelled murder;" that when she appeared at the door Mrs. Baker pulled her away, shut the door, pulled down the shade, and locked the house below, and decedent, who was alone at the time, lifted the window-shade and "yelled out." Mrs. Baker ordered Tighe away, and said they could not have Mrs. Berrien. Dr. Darlington says that when decedent was at Mrs. Baker's she said she wanted to get away from there, and at various times said she would like to leave; that they maltreated her; that she did not get proper food, and was not allowed to go out, and on several occasions when she said these things she gesticulated violently. He proposed that she go to an old ladies' home, as she was discontented, and at first she said she would like to go, and afterwards said she would not. He says that there was little said by Miss Berrien or Mrs. Baker in regard to her going or staying, but he recollects that Mrs. Baker said she did not think she ought to go away from the house, and what they said was in opposition. He further says that some one was almost always by when he was with her. The decedent's declarations, while still at Mrs. Baker's, are in harmony with the testimony that she was during the last year of her residence there under restraint. She told her clergyman, Mr. Thompson, that she was miserable at her daughter's, and that Mrs. Baker had once laid hold of her and shook her, and at another time pounded her; and that she was not allowed to leave the house, and was put in a room where she could not get out; and that when she spoke of being pounded she became very much enraged.

About the 20th of May, 1888, before 4 o'clock in the morning, finding a window in the parlor where she slept unlocked, she raised it, and through it reached the yard and the road, and, in an enfeebled condition, with sight impaired, she made her way a distance of some 40 rods to the residence of Mrs. Hallinan, a neighbor, whom she aroused, and by whom she was admitted. She cried to Mrs. Hallinan to save her and protect her until her son could come and take her. She then fainted, and Mrs. Hallinan laid her on the sofa, where she was for about 20 minutes, and by giving her stimulants she revived a little. She stated to Mrs. Hallinan that her daughters had treated her very badly, and that she watched all night to get through the window, because they had shut her up, and would not let her get out, and had tried to make her out insane. The next day, when Mrs. Baker sent a carriage for her, the decedent said she would rather die in the street than go back. A day later her son, the proponent, who had been sent for by Mrs. Hallinan, came to see her, and she told him that she wanted to go with him; that on the night she left Mrs. Baker's house Mrs. Baker was trying to get her to give her some property, and she would not do it, and Mrs. Baker declared that she would leave her there to die, and went up-stairs and left her. She told him that she had been waiting for an opportunity to make her escape, and on the dawn of the day she got out of the window and walked to Mrs. Hallinan's house, following the line of the fence. When decedent was signing the power of at-

torney at Mrs. Hallinan's house she said to Mrs. Baker, who had found her way into the room, and endeavored in a boisterous manner to prevent her mother from signing that paper, that she had kept her a prisoner; and would not let her see her little grandchildren when they passed the house, and that she should cut her off. She also told the proponent that they had ill-used and misused her scandalously, shut her up and made her a prisoner for over a year, and did not allow her to see her children, or have private intercourse with any persons. The decedent's declarations of her testamentary intentions are in harmony with the will. On the 28th of May she was taken in a carriage to the residence of her son, the proponent. While there she stated to him, and also to his daughter Emma, and to Mr. Fitch, that the Bakers should never have a cent of her money.

There is no evidence in the case from which I can infer fraud, or the exercise of undue influence, in the preparation and execution of the paper. The proponent was given only a trifling bequest,—an old rocking-chair. The testimony shows that the decedent, though capricious, was a woman of determined will, and even headstrong, and all her life had been accustomed to have her own way, and that this continued to be her characteristic down to a period after the date of the execution of this will.

Section 829 of the Code was waived by proponent's counsel, as he did not object to the testimony of contestant, Maria G. Berrien, nor to that of one other witness, both of whom were disqualified as interested persons from testifying to personal communications with decedent. Maria G. Berrien testifies to several instances in April, 1887, when the decedent acted in a very boisterous and excited way, and displayed great anger over trifling matters; similar outbreaks in December of that year, and in May, 1888. Mrs. Baker, the other contestant, and her husband, testify to the same effect; also Dr. Darlington, Mr. Eidman, and Mrs. Flanagan. The proponent describes decedent as a woman of strong will and intolerable temper; "was always boss in her house," etc. There seems to have been a marked change in her conduct after her escape from Mrs. Baker's. Mrs. Hallinan states that during the eight days she was with her she "talked as she had done always," and she "saw no difference in her," except that she was more feeble and delicate than formerly; that she "walked around the same as any of them," and would sit up and lie down at spells, never made any noise, and that she talked to witness' husband and her children as she had always done. The proponent states that after she was removed to his residence she was never violent, and never abused his family, always knelt at family prayers, and never cried out except on one occasion, and that when she was suffering from an attack of pleurisy. Mr. Thompson, the clergyman, though he saw but little of her there, discovered no evidence of dissatisfaction, and decedent seemed to be comparatively quiet. But Dr. Darlington states that after she had gone to Mr. Berrien's there was violent deportment, but, in the same connection, he testified that the decedent said her daughters had maltreated her, and she still continued in the same frame of mind in regard to them. I think it is fairly inferable that that is the violence he referred to, as he mentioned no specific acts that he observed after her removal. There is conflict of evidence as to the conduct of decedent at proponent's house. But allowing for the tendency to exaggeration in the opposing members of the Berrien family, and giving due consideration to the testimony of others, it is evident that the decedent was much quieter after she left her daughter's, and was freed from the restraint to which she was there subjected. In respect to decedent's memory there is conflict in the testimony. I am satisfied, however, that her memory was sound and disposing. The testimony of Mrs. Hallinan and the proponent shows that she improved in health after leaving her daughter's, though she never was well, and in July following she died; her disease, as certified by her attending physician, being chronic diarrhœa from chronic gastritis, with age as

a contributing cause.   All admit that the decedent's sight was impaired, but I am satisfied that the respective parties exaggerate or belittle the extent of the affliction, according to their interest.   Dr. Miles states that she had a cataract.   That she could recognize the members of her family when not too far distant I am convinced; and others she recognized by their voices.   Her hearing was also impaired.   But these afflictions have but an incidental bearing in determining the issue before me.

Two events took place after the decedent's departure from Mrs. Baker's house, and which have an important bearing on the question of her mental condition at and about the time of the execution of the will.   On the day of her arrival at Mrs. Hallinan's she asked her son, the proponent, to take care of her; and he said he could not do it without legal authority,— a prudent suggestion, in view of the relations existing between him and his sisters.   In consequence of this suggestion she consented to have a power of attorney drawn up by Mr. Peake, who at the time of its execution was with her about three-quarters of an hour to an hour.   The instrument was read to her carefully, and she assented to it, and it was duly acknowledged shortly after before Mr. Fitch, as notary public, in the presence of the proponent, her son, and Mr. Peake, all of whom testify to the efforts of Mrs. Baker, who came in at the time, to prevent the decedent from signing the instrument.   It was not produced in evidence, but according to the testimony of the proponent it gave him the power to draw money from the savings bank.   On the 4th of June, at the proponent's house, she executed a deed of her undivided half of the house to her grandson Peter B. Berrien.   It was drawn by Mr. Peake, at his office, from instructions by her son, the proponent, and was taken the next day to proponent's residence, where it was executed, Mr. Peake superintending the execution, and Mr. Fitch took the decedent's acknowledgment.   The signature is a scrawl, but with a knowledge of the fact that it was intended for "Rachel Berrien" one can decipher the first part of a capital R and the letters "achel Berrien."   Mr. Peake states that he told the decedent where to sign her name.

The next event of importance was the preparation and execution of the will.   On the afternoon of June 18, 1888, in response to a message received from the proponent, through the hands of one of his daughters, Mr. Peake went from Yonkers to the residence of the proponent at Spuyten Duyvil, and there met the decedent, and had a private conversation with her before proponent's arrival.   She stated to him that she wanted to make her will, and that she did not want her two daughters, the contestants in this proceeding, to have any benefit thereunder; that both had ill-treated her, and kept her a prisoner, would not allow her to see her son or his children, and that she had finally to climb out of the window at Mrs. Baker's house, and go to a neighbor's, to get away from them.   When Mr. Berrien, the proponent, arrived at the house, the decedent requested her granddaughter Amanda to leave the room, as she did not want her to know what was in the will, and she then gave her instructions to Mr. Peake, who then and there embodied them in the instrument under consideration.   During the conversation the proponent asked if she had not forgotten his son Benny, and she replied that she had not; that she did not intend to give him anything, because he had once borrowed a small sum of money from her, and when she asked for it he laughed at her.   When asked whom she desired to have appointed executor she named her son, the proponent.   When the paper was completed it was read by Mr. Peake to her, and she pronounced it all right.   He stated that he would come the next morning with Dr. Miles and Mr. Fitch, as subscribing witnesses, to execute it.   It was executed in their presence, and in the presence of the proponent.   The decedent's hand was placed upon the paper, and she made her signature as it appears thereon, without aid.   Mr. Peake, Mr. Fitch, and the proponent state that the decedent herself declared the paper to be her last will

and testament, though Dr. Miles is of the impression that she did so in answer to a question put to her by Mr. Peake. She requested the witnesses to sign the instrument as subscribing witnesses. Dr. Miles states that he had never seen the decedent before, and that he came on that occasion at the request of Mr. Peake to examine the decedent in respect of her soundness of mind; that he had a conversation with her for about 15 minutes, in which she spoke of her first residence in Spuyten Duyvil, of her husband having been killed, of the number of children she had, when they were born, and of their respective ages; and she impressed him as being possessed of a good memory, and that her conversation was rational, and as the result of his examination he pronounced her to be of sound mind. Mr. Fitch, one of the other subscribing witnesses, had shortly before seen her on two previous occasions, on which he had taken her acknowledgments to the power of attorney and the deed, and to him she seemed perfectly competent to make a will. The testimony of the proponent agrees with that of Mr. Peake in respect to the preparation of the paper, and also with that of the three subscribing witnesses as to what transpired at the time of its execution, though he testifies that he himself read the instrument to the decedent after it was prepared. In respect to the handwriting of the decedent to the will, it is evident that there is great deterioration in its quality, as shown by the signatures to the deed and the will executed in June, 1888, from the signature to the will of April 25, 1885. The fact is important only as it may afford evidence as to her mental condition. In a period of over three years she had grown physically weaker, and as she was during 1888 an invalid, and died on the 25th of July, about five weeks after the signing of the will, that fact would alone account for the want of firmness in the signatures written in June; and as the proofs show that her sight was much impaired, and, as Dr. Miles states, from a cataract, that would explain the irregularity of the outlines of the letters.

Contestants claim that the violent conduct and language of the decedent, the profane and obscene utterances which were testified to as having been made by her, and that certain delusions she labored under in respect to her food at Mr. Baker's, and her means, offers of extravagant sums to persons who performed trifling services, together with her advanced age and the physical decay resulting therefrom, followed in a few weeks by her death, are concurrent evidences of the decay of her mental powers to an extent that, for months before the instrument was executed, she was suffering from senile dementia, and was incompetent to execute a valid will. To sustain this view they called Dr. O'Brien, whose experience with the insane has been confined to cases that have come under his observation in his general practice and in visiting institutions for their care. In answering hypothetical questions propounded to him in which the facts testified to on behalf of the contestants were recited, he stated that in his opinion the decedent was laboring under senile dementia. To my mind, however, the violence of the decedent is easily explained by the fact that she was a woman of dominating will and high temper, and that her desire to visit her old home, and her efforts to communicate with her grandchildren as they passed, were thwarted by her daughters. In the restraint exercised there is sufficient in the case to justify the belief that the daughters were not acting altogether from unselfish motives. The relations of the Berrien family have for a long time been discordant. The proofs show that decedent's daughters opposed her leaving them. With a self-willed woman this would make her impatient, and further efforts to thwart her wishes would engender resentment, and finally, even violent and unreasonable language and conduct towards those who restrained her movements. When at last she escaped, her antipathy found expression in the will by which the daughters were disinherited, and the children of her son favored. The fact that after she reached the residence of Mrs. Hallinan, and thenceforward, there were no such exhibitions of violence, though she indulged in the expres-

sion of resentful feelings towards her daughters, even giving due consideration to the exclamations testified to by contestants' witnesses, shows that the change of surroundings had greatly mollified the asperities of her conduct, and that her general course of life was far from being irrational. Senile dementia may or may not accompany physical degeneration. The delusion of the decedent in respect of having a large amount of property, even admitting that it existed, was not of a character to raise a presumption against her competency to make a will. It has no relation to the provisions contained in the instrument. The estate was small, consisting mainly of articles of household goods, and less than $2,000 in money in a savings bank. By the will she gives specific articles to different legatees and provides for a division of the residuary estate equally between four children of the proponent. The provisions were dictated by her to a scrivener, an able and reputable lawyer, in the absence of any of the parties interested. That she knew that she had money in bank is shown by the evidence of Mr. Baker, who testified that she signed a check to draw moneys therefrom during the last year of her life. The statement that she was starved is more likely to have been the result of ill feeling than the expression of an insane delusion.

In the leading case of *Stevens* v. *Vancleeve*, 4 Wash. C. C. 262, the learned judge says that a man "may not have sufficient strength of memory and vigor of intellect to make and to digest all the parts of a contract, and yet be competent to direct the distribution of his property by will." In this case there was no serious enfeeblement of memory. She selected the beneficiaries, and had already declared her purpose to exclude her daughters. In *Clapp* v. *Fullerton*, 34 N. Y. 190, the court says: "The right of a testator to dispose of his estate depends neither on the justice of his prejudices nor the soundness of his reasoning. He may do what he will with his own; and if there be no defect of testamentary capacity and no undue influence or fraud, the law gives effect to his will, though its provisions are unreasonable and unjust." There is nothing in the case to show that even persuasion, much less undue influence, was used by the proponent or his family to procure the execution of the instrument, and the discrimination against her daughters, considering the restriction they had imposed upon her, could not be called an act of injustice. In *Society* v. *Hopper*, 33 N. Y. 619, the court says: "On questions of testamentary capacity, courts should be careful not to confound perverse opinions and unreasonable prejudices with mental alienation. These qualities of mind may exist even in a high degree, and yet, so far as regards the view which the law takes of the case, the subject may be sane, and competent to perform a legal act, and be held responsible for crime." Whether the decedent's opinions were perverse, or her prejudices unreasoning, may be fairly questioned. In *Trumbull* v. *Gibbons*, 22 N. J. Law, 117, the court says: "It is incumbent upon the party attempting to defeat the will to prove insanity." The opinion of Dr. O'Brien has little weight, when considered in connection with the evidence adduced, that the will was prepared under the personal direction of the decedent; that she dictated its provisions, with a full knowledge of her kindred and their respective claims upon her bounty; and had perfect memory of the property which was to be the subject of her gifts to them. The will must be admitted to probate.