## COTTON et al. *vs.* ULMER.

[CONTEST OF WILL IN PROBATE COURT.]

1. *Sanity; presumption as to.*—Reason being the common gift of God to man, every man is presumed to be sane, and insanity can only be proved by clear and unexceptionable evidence.
2. *Partial insanity; what will invalidate.*—Partial insanity will invalidate contracts generally, and will be sufficient to defeat a will the direct offspring and fruit of partial insanity.
3. *Will, contest of; what improper charge as to sanity of testator.*—If on an application to prove a will, an issue is made up as to the sanity of the testator, and submitted to a jury, a charge of the court is erroneous which instructs the jury that, unless the jury believe from the evidence that testator, if of sound mind, would have included contestants, his grand-children, in the benefits of his will, they can not set the will aside because he may have excluded them, under an insane delusion as to their father.

APPEAL from Probate Court of Dallas.
Tried before Hon. J. F. CONOLEY.

THIS case is an appeal from the probate court of Dallas county, in the matter of the application to prove the last will and testament of William Curtis, deceased.

The proponent is Miss Mary Eliza Ulmer, the grand-daughter of testator, and daughter of Mrs. Mary Jane Ulmer, the testator's daughter, who died after the alleged last will and testament was made, and after the testator's death.

The application was contested by Martha and Lucy Cotton, also grand-daughters of testator, and daughter of J. L. Cotton, and Lucy, his wife, the daughter of testator, who died several years before testator. The contestants are infants under the age of twenty-one years, and are represented by Pleasant G. Wood, their guardian *ad litem*.

The heirs-at-law of said testator, at the time the alleged will was propounded, were one living daughter, Mrs. Ann Eliza Babcock; Annie and Mary Curtis, children of testator's deceased son, Darius Curtis, proponent, and contestants.

At the date of the alleged will, the 27th of October, 1868, testator was eighty-six years of age. All the objections made by contestants were withdrawn, except the objection as to the soundness of testator's mind at the time the alleged will was made. As to this objection, an issue was made up and tried by a jury, who returned a verdict that the testator was of sound mind and disposing memory at the time the will was made; thereupon, said probate court, by its decree, declared said alleged will to be the last will and testament of said William Curtis, deceased, and ordered the same to be recorded as such.

By said will, all of testator's estate, consisting of a plantation of five hundred and sixty acres of land, and personal property, is given to his said daughter, Mrs. Ulmer, during her widowhood, for the maintenance of herself, proponent, and the said children of Darius Curtis; and in the event of her marriage, then to proponent, who is required to maintain and educate the children of Darius Curtis. Nothing is given to contestants.

On the trial a bill of exceptions was taken by contestants, which sets out all the evidence in the case. A num-

ber of witnesses were examined by the parties, and the record is quite voluminous. The material portion of the evidence, as to the sanity of testator, was as follows :

Proponent introduced the following witnesses :

*W. B. Shields*, a witness for proponent, testified in substance, that he wrote the will at the request and dictation of the testator, Curtis, and as nearly as possible in testator's own language. Testator had been sick, and was quite feeble, but got out of bed when witness came ; witness had only known him since 1866 ; testator was a man of strong feeling, and " spoke his mind freely about whom he disliked." * * * When witness was writing the will, testa-. tator told him Cotton wanted to marry Mrs. Ulmer, and he limited her interest in the property during her widowhood, because he did not want Cotton to get any of it. * * ' Testator said " Cotton got into his family by the back door." * * * Testator was quiet and self possessed while making his will, and did not curse Cotton when his name was mentioned on that occasion, but witness has frequently heard him curse Cotton very bitterly.

*D. Stephenson*, a witness to the execution of the will, testified that Curtis drank. * * * Curtis was an honest man, seemed to know all about his business, and was very industrious. * * * Had heard him curse Cotton, and he became excited whenever his name was mentioned. *
* * He always became excited when he talked about religion, declaring that there was a distinction between religion and christianity; that religion was a cloak, and he had no faith in it, but he believed in God, and claimed to be a christian. * * * Cotton, he said, ought to support his own children. * * * Saw no sign of insanity or drunkenness when will was made. * * * Curtis was emaciated, but not extremely feeble.

*Dr. Thos. Hunter*, testified as follows : Had known Curtis since 1846; was his physician during his last illness; he was, when cool, very sensible ; seemed to be well read, but not well educated ; when excited he talked very violently, without any apparent cause. * * * His mind was to some extent disordered while in fits of passion, and has been peculiar a long time.

*E. M. Perrine*, has known Curtis since 1826; he was a man of violent prejudices; never saw anything in him to make me think him insane; he took a prejudice against witness in 1846, and never got over it.

*B. H. Craig*, had known Curtis for many years. * * Had often heard him say he had to provide for Dr. Ulmer's family; he liked Ulmer, but cursed him for being improvident. Never saw anything in him to indicate insanity or unsoundness of mind; frequently heard him curse Cotton; Cotton's character as a minister and a man is good; he lived ten years in Cahaba before he married Curtis' daughter. * * * Have seen Curtis walking the street, gesticulating violently, as a man in sudden passion.

*Mary Eliza Ulmer*, testified in substance that she had often heard Curtis speak of his advancement to his children. * * * Curtis said he had given Mrs. Babcock more than he then had, (referring to his losses by the war) and did not intend to give her any more. * * * He disliked Cotton, because his daughter married him against his wishes, and was afraid he would marry witness' mother, and threatened in that event to leave her without support. After he had made his will, witness, at her grand-father's request, carried it to Gen. Morgan, and asked if it could be broken. * * * Curtis was a man of strong attachments and dislikes, and spoke out his feelings without regard to any one. * * * He was very fond of Mrs. Cotton before her marriage, but not after that. * * * His dislike for Cotton weaned him from his daughter; Cotton is an itinerant Methodist preacher. * * * Curtis disliked Cotton immoderately; * * * never heard him speak respectfully of him. Curtis spent much of his time with witness' mother. * * * Have often heard him call Cotton a thief, rascal, scoundrel, and other epithets. Curtis said Cotton's conduct was not gentlemanly to him, and that he never intended to give him anything. * * Curtis was a man of his own head, and not easily influenced. * * * He drank sometimes; on one occasion he made two of his grand-children take a boiler and go in the street at Cahaba, on Sunday, and clean it. * * * He was always kind to witness. * * * When Mrs. Cotton, in

Cotton et al. v. Ulmer.

her life time, came to see Curtis, he was kind to her, but abused Cotton to her. When she died, he said he "was glad of it; she would have a home now."

*J. Quartemas*, testified, in substance, that he had known Curtis since 1838. Have seen a great deal of him, and never saw anything to make me think he was not of good mind. Don't know his habits; have seen him intoxicated once or twice. * * * Whenever a preacher was mentioned, especially Cotton, he would curse and abuse them. * * * Have heard him curse two or three other Methodist preachers. * * * Said they ought to be plowing instead of preaching. * * *

*R. S. Hatcher*, had known Curtis forty or fifty years, and formerly had much talk with him about politics and various subjects. He was considered an honest, industrious, and frugal man. He was always a man of strong prejudices; was always excitable. Old age had affected his health, but witness saw no effect on his mental condition. His feelings seemed to be founded in his honest convictions.

Here proponents closed their evidence. Contestants introduced the following witnesses:

*Jas. McMurray*, had known Curtis for ten years; did not see much of him, except a few months in 1865. He had peculiar ways; said several times he wanted to die, but not in the winter time. Said one of his grand-children was a fool, and ought to have a guardian.

*J. C. Hodges*, lived with Curtis a year in 1862, and lived near him since the war. Often heard him speak of Cotton; would curse him, and became excited at the mention of his name. From what witness knew of Curtis, he says he did not have his right mind. When he paid me, on one occasion, for my services as agent, he gave me one hundred dollars more than was due, and when mentioned by me, he cursed me and said he knew how to draw orders forty years before witness was born; but he corrected the mistake. Witness thought him insane at times.

*W. M. Martin*, has known Curtis since 1855; on one occasion, in 1855, Curtis rode up where witness was, and asked "what d——d rascal that was," pointing to a man

Cotton et al. v. Ulmer.

who had just left, and said he met him a mile back and had his pistol ready to kill him if he said a word.  *  *  * Have heard him curse Cotton; said Cotton was a d——d preacher, too lazy to work.  Have heard him talk of Cotton fifty times, and he invariably got excited and abused him; said Cotton had not mistreated his daughter, but was a d——d lazy preacher.  In 1868, he sold to a negro for one hundred dollars a mule worth two hundred dollars.  * *  *  His mind was sound on some subjects, and unsound on others; his mind did not work right when he was in a passion; have seen him drunk several times.  He was not insane about business matters.

*E. R. Moore*, knew Curtis well; very often saw and talked with him.  *  *  *  He had an inveterate hatred of Cotton.  *  *  *  Have heard him call Cotton all manner of names; always became excited when Cotton's name was mentioned; he drank.  *  *  *  He believed in God, but thought many professed christians were humbugs.  *  *  * Have heard him curse other members of his family; have frequently seen him talking and gesticulating to himself, and striking his stick.  It is my opinion that his mind was unsound.  Witness was a Protestant Methodist preacher, and talked once or twice on theological subjects with Curtis.  Curtis was not a well educated man, but was a well read man.  *  *  *  He applied to me to make him a twenty-dollar coffin; did not want a more costly one.

*Geo. W. Gayle*, had known Curtis for many years; Curtis was in the habit of talking on the street, and towards the latter part of the war would get much excited about Gen. Jackson, and at the mention of his name would curse him and Henry Clay.  *  *  *  Have heard him curse Cotton many a time on the streets, as well as in private conversation; he always became enraged at the mention of his name.  Met him once near his house, talking to himself in an angry and excited manner, and asked him what was the matter, and he replied that " they want my property, damn them."  *  *  *  Heard him curse other members of his family.  His mind has been unsound ; he had a monomania on some subjects.

*Wm. Kelsey*, had known Curtis twenty-five or thirty

years; was intimate with him. Heard Curtis talk very sensibly about his farming matters. Heard him curse Babcock and others, but knew him to have a good bored well filled up, as he said, to prevent little negroes from falling in, although it was too small for a child to get in it.

*Joel Babcock,* was grandson of Curtis, and always lived near him. The witness testified to the filling up of the bored well (although water was very scarce on the farm) by Curtis' directions, to prevent little negroes from falling in it. * * * Curtis always got excited and cursed Cotton, whenever his name was mentioned. * * * Have seen him often by himself, flourishing his stick and cursing; sometimes he abused everybody in his family. This witness testified to numerous acts of Curtis, showing eccentricities and weakness of mind. * * * Have heard him speak of advancements to Mrs. Babcock, to Darius Curtis, and Mrs. Ulmer, and Mrs. Cotton.

*John Babcock,* a grandson of Curtis, had known him for many years, and always lived near him. In his later years Curtis became very vulgar and obscene in his own family. * * * Often heard him curse Cotton bitterly.

*Jas. L. Evans,* had known Curtis since 1842. * * * Had heard him speak of the advancements made to his children. This witness testified that if the advancements by Mr. Curtis to his children were estimated, in case of intestacy, it would go in about equal proportions to the children of Mrs. Lucy Cotton and the proponents of the will, and that Mrs. Babcock and Darius Curtis had drawn about their full share. The testimony of this witness as to Curtis' hatred of Cotton was substantially the same as that of the other witnesses on this point. Curtis made a will in 1856, which he kept two years, but afterwards changed. * * * Witness did not think Curtis of sound mind as far back as 1860.

*Rev. J. S. Cotton,* testified that he was son-in-law of Curtis; married his daughter in 1853. [This witness testified at length to the circumstances of the marriage, and Curtis' dislike, &c., which is unnecessary to be set out.] He was engaged to Mrs. Ulmer at the time of his death; the chief reason why the marriage was not consummated was

on account of his want of means.   Curtis correctly stated
to witness, several times, the contents of his will, and
seemed to take pleasure in doing so, and was cool and col-
lected about it.   Being interested, witness would not give
an opinion as to Curtis' sanity.   Curtis rarely raved or
swore in witness' presence.

*W. N. Boynton*, had known Curtis since 1853.   *   *
Testified to Curtis' great dislike to Cotton, the testimony
on this point being in substance the same as that of the
other witnesses, as also to Curtis' habit of gesticulating
and talking in an angry manner to himself.   *   *   *
Thinks Curtis was insane about Mr. Cotton and religion.
Cotton was a man of unexceptionable character.

*Martha Cotton*, lived in the house with Curtis.   *   *
Towards the latter part of his life he was in the habit of
cursing Mrs. Ulmer and her daughter.   *   *   *   Her tes-
timony was the same as that of the other witnesses as to
Curtis' dislike of Cotton.

In the court below, nineteen charges were given, the first
by the court, of its own motion, and the remainder at the
instance of the proponent; all of which were duly excepted
to by contestants, the appellants in this court.   There were
also numerous objections to the rulings of the court in the
admission of evidence.

The only charges noticed in the opinion are the eight-
eenth and nineteenth charges, which are set out in full
therein.

The errors assigned are, that—

1st. The court erred in the charges given.

2d. As shown by the bill of exceptions. .

P. G. WOOD, and PETTUS & DAWSON, for appellants.—Un-
der sections 1910 and 1916 of the Revised Code, testament-
ary capacity depends, in part, upon *soundness of mind.*

Dr. William A. Hammond, who was surgeon general in
the United States army during a part of the late war, in a
" Synopsis of the General Subject of Insanity," which is
published in connection with the celebrated McFarland
trial, which recently took place in New York, says:

" The mind of man may be appropriately divided into

*four distinct parts,*—the perception, the intellect, the emotions, and the will. Either one of them may be exercised independently of the other, though they are very intimately connected, and in all continuous mental processes are more or less brought into relative and consecutive action.

" Thus, we see an object, hear a sound, taste a flavor, smell an odor, or touch a substance, and *perception* is exercised.

" We form an idea of the material which has been brought to our knowledge through the medium of our senses, and the *intellect* acts.

" We are moved to pleasure, disgust, affection, or some other *emotion,* by the information obtained and judgment formed.

" And we act in accordance therewith, and thus bring the *will* into operation."

Speaking of that part of the mind that he has denominated the intellect, he says:

" We all at times, momentarily have illusions and hallucinations, but the judgment at once prevents continued deception. When this fails to be the case, delusion exists, and we are the subjects of intellectual insanity.

" Thus, a person has a sensation of a fly or an ant crawling over his skin. He applies his finger to the spot, and ascertains that he has a false sensation, an illusion, or a hallucination. This is probably the end of it.

" But, if he should happen to imbibe from this erroneous impression the idea that a fly or an ant really *was* on his skin, and should persist in this opinion against all reason, he would have a delusion, and would be intellectually insane.

" To what point this delusion might carry him, no one could predict. It might, and in a perfectly logical manner, prompt him to steal, commit arson, murder his dearest friend or his worst enemy, *or make a will leaving all his property away from his natural heirs.* Delusions are the essential feature of intellectual insanity, but of no other complicated form of mental derangement.

" Insane actions are often the direct consequences of delusions.

"The will, when the organism is in a normal condition, acts in obedience to the intellect,—to the ideas which the healthy brain elaborates.

"Persons intellectually insane follow the *same law*, and do those things to which their delusions *logically* lead them, —*a delusion being a false conception of the intellect which is accepted as true, it exercises the same power over the will as a true belief*.

"A man, therefore, who imagines he hears the voice. of God, commanding him to kill his wife or his children, obeys with as much unquestioning faith in the reality of the impression made upon his auditory nerve as Abraham had when he received the divine command to sacrifice his only son.

"The emotions are also subject to insane exaggeration, through the influence of motives which act slowly, but with constantly increasing force.

*   *   *   *   *   *   *

"Here there is no delusion, no error of judgment, but simply an inability to apply the reasoning powers to the consideration of the subject, or to exercise the will against the overpowering emotion.

*   *   *   *   *   *   *

"The emotions are also frequently secondarily deranged through the morbid operations of the intellect.     *     *

"The brain may be so disordered that insanity is manifested only as regards the will.

" *Hence, the mind may be disordered as regards the perception, the intellect, the emotions, and the will, separately; and to this partial derangement the term 'monomania' is often applied.*"

"Sound mind—that state of man's mind which is adequate to reason, and comes to judgment upon ordinary subjects like other rational men."—Bouvier's Dictionary.

"Sound—perfect, as intellect ; not broken or defective ; not enfeebled by age or accident ; not wild or wandering; not deranged ; as a sound mind, a sound understanding or reason."—Webster's Unabridged Dictionary.

" *A sound mind is one wholly free from delusion*, all the intellectual faculties existing in a certain degree of vigor

and harmony ; the *propensities, affections and passions*, being under the subordination of the *judgment and the will*, the former being the controlling power, with a just perception of the natural connection or repugnancy of ideas."—Shelford on Insanity, 39, §§ 40, 41, 42, 43.

The great case of *Dew v. Clark* may be considered as establishing the doctrine that partial insanity will invalidate a will which is fairly to be inferred the direct offspring of that partial insanity.—1 Williams on Executors, 23.

Where the testimony in a cause conducing to prove that a will was the direct consequence of the *delusion* under which the testator labored ; a *delusion* calculated to pervert his judgment with respect to the disposition of his estate, *it is perfectly clear that he could* not be considered as possessing a testamentary capacity, *although upon other subjects he may have been rational and sane.— Townshend v. Townshend,* 7 Gill. 10.

If partial insanity, or monomania, is established, and the will is the result of such insanity, the act is vitiated.—*Florey v. Florey*, 24 Ala. 249.

Proof of the existence of partial insanity will invalidate contracts generally, and will be sufficient to defeat a will the direct offspring of that partial insanity ; although, the testator, at the time of making it, were sane in other respects, and upon ordinary subjects.—Shelford on Insanity, p. 296.

In most cases of delusion, the delusion founds itself, originally, on some slight circumstance, the magnifying of which, beyond all reasonable bounds, is nearly or quite as good in proof of its being a delusion, as the taking up some absurd prejudice which is utterly unfounded, or that rests upon no basis.—Shelford on Insanity, 41.

In all the cases of lunacy which have filled Westminster Hall with the most complicated considerations, *the subjects of them have not only had memory, and a perfect knowledge and recollection of all the relations they stood in toward others, and of the acts and circumstances of their lives, but have, in general, been remarkable for subtility and acuteness. Defects in their reasonings have seldom been traceable, the disease consisting in the delusive sources of thought ;* all their deductions

within the scope of malady being founded upon the immovable assumption of matters as realities either without any foundation whatsoever, or so distorted and disfigured by the fancy as to be nearly the same thing as its creation. Shelford on Insanity, 43.

*Such persons* (a class of partially insane persons) *often reason with a subtlety which puts in the shade the ordinary conceptions of mankind; their conclusions are just, and frequently profound; but the premises from which 'they reason, when within the range of the malady, are uniformly false; not false from any defect of judgment or knowledge, but because a delusive image, the inseparable companion of real insanity, is thrust upon the subjugated understanding, incapable of resistance, because unconscious of attack.*—Shelford on Insanity, 44.

If an *idiot* should make his testament so well and wisely in appearance that the same may seem rather to be made by a reasonable man than by one void of discretion, yet this testament *is void in law.*—1 Williams on Executors, 14.

Justice Sergeant, in delivering the opinion of the supreme court of Pennsylvania, in 1839, said:

"It appears to me that the only question in such a case is, whether the person was of sound memory and discretion. Considering the act done, in all its bearings, and judging of the soundness of the mind of the supposed testator by his conduct and declarations at the time, as connected with his previous insanity, and the degree of restoration of mind in the interval; and that if the erroneous and groundless impression received during the time of his delirium, shall retain their hold, (whether by some physical derangement of the brain, or by some indelible stamp on the thinking faculties,) that person must be considered still under a delusion,—the effect continues, and it is only by effects we can judge of the exciting cause. *And if he is under a delusion, though there be but a partial insanity, yet, if it be in relation to the act in question, it is well settled it will invalidate contracts generally, and defeat a will which is the direct offspring of this partial insanity.*"—Wharton & Stile's Med. Jur. 17.

A monomaniacal delusion, inveterately entertained by a testator against one who would otherwise have been the

natural object of his bounty, and shown to be the reason which has excluded him from it, and to have had no other existence except in the distempered imagination of the testator, would invalidate a will made under such influence.

And, for the very plain reason that the will made under the suggestion of such an insane delusion, is not what the law requires a will to be, the product of a mind capable of reasoning rightly.

For, although the law recognizes the difference between general insanity, yet, if the will was made under the influence of such partial insanity, and as the product of it, *it is as invalid* as if made under the effects of an insanity never so general.—Wharton & Stile's Med. Jur. 17.

The foregoing citations establish as law the following points :

1. That a will is not valid unless the testator was of sound mind at the time of making the will.

2. That the law recognizes partial insanity.

3. That the law recognizes general insanity.

4. That a will made by a person who is insane generally is invalid.

5. That a will made by a person who is partially insane, is invalid, if the will is made under the influence of the partial insanity, or is the offspring of it, or is the result of it.

6. That a mind that is partially insane may, and often does, reason correctly and logically, and has a retentive memory.

7. That the mind of a person, in making a will, may be influenced both by an affectionate regard for one or more persons, and by an insane delusion as to one or more other persons—(and a will so made, will be void—see point 5.) See paragraphs above.

8. That the true criterion and test of the presence or absence of partial insanity is not, whether the mind can reason and has memory, but is the presence or absence of a permanent delusion. A mind in which there is such a delusion is partially insane, even though it can reason correctly, and even though it has a retentive memory, as the delusion affects not the power to reason—the power to

draw correct conclusions from given premises; but, it consists in this—that "the mind conceives something to exist which has still no existence but in its own heated imagination, and is incapable of being reasoned out of that conception."—See paragraphs above.

9. That a will that is the offspring of partial insanity is invalid, not because it is necessarily an unwise or an improvident will, but because the testator is not of sound mind.

The charge No. 18, uses this language : "Unless the jury believe from the evidence, that William Curtis, if of sound mind, would have included Mr. Cotton, or his children in the benefits of his will, they cannot set aside the will, because he may have excluded them under an insane delusion as to Mr. Cotton."

Besides being in conflict with the points named, this charge, in this language, imposes on the jury the duty of ascertaining what kind of a will a partially insane man would have made, if he had been sane! and it requires the jury to give effect to a will, even though it may be found by them to be the offspring of a mind partially insane, if they shall further find that the testator, *sane*, would have done what the testator, *insane*, did do.

If such a charge could be upheld as law, so also can the eighteenth charge given in this case, but not otherwise.

MORGAN, LAPSLEY & NELSON, *contra*, after commenting on the evidence at length, contended that it established that Mr. Curtis was a man of strong, decided and intense feeling on all subjects of moment. In politics, religion, patriotism, and in his family relations, he was a proverb for dishonesty, and made no concealment of thoughts or feelings that many men punish themselves to disguise.

He expressed his dislike for Mr. Cotton in terms of bitterness, and pungent sarcasm, and did it on any occasion when the subject came to his attention.

He was a man of much more than ordinary information, and vigorous mind, terse and sarcastic in his modes of expression. These traits induced younger men to annoy him, and to provoke him into exhibitions of temper.

He would rave and curse about Mr. Cotton, and the dis-
position grew on him until he became singular and peculiar
in such displays.    But with all this, his mind was sound,
and his memory and judgment were unimpaired.    Every
witness who gave an opinion as to his partial insanity
shows, by the fact on which he predicted the impression,
that he confounded these evidences of temper with mental
disease.

The testimony of every witness sworn shows, that he
possessed a degree of intellect, a soundness of memory,
and judgment superior to most men of his age.

Mr. Cotton shows, that in all this rant and clamor which
the old man kept up about him, he never cursed *in his
presence.*

Mr. Cotton well knew of his conduct [and conversation,
and that his children heard it, and he knew what the old
man did and said in their presence.

It can hardly be supposed that Cotton would still have
kept the children there under the influence and direct con-
trol of Mr. Curtis, if his conduct had been so very bad as
it is now represented to be by others.

The circumstances attending the preparation and execu-
tion of the will established unqualifiedly, the sanity of Mr.
Curtis, and show absolute freedom from all undue influ-
ence.    Few cases occur, where stronger proof is furnished
of sound mind, perfect memory, and cool and deliberate
reasoning.

The will is just and wise in its provisions, perfectly
adapted to the condition of his property, and of his family,
in accord with his long settled convictions and affections
and is such a direct and complete response to his wishes,
as expressed on almost every occasion, that no one can
doubt that every word in it was but the expression of his
own mind and heart.    Aside from all feeling toward Mr.
Cotton, it was right in itself that Mr. Curtis should have
placed the burthen of supporting his children on their
father rather than to divide up his small estate, and destroy,
or render precarious the support of the unprotected orphan
girls he left alone in the world.

This summary of the facts established by the evidence,

is presented to draw the attention of the court to the phases of the case, in which the charges given were relevant, and otherwise to explain them.

We will now proceed with the discussion of the legal question involved in the charges.

The 18th charge contains the proposition that, when a testator has an insane delusion as to a person, not entitled to share in his estate, this does not render him incompetent to make a will. If William Curtis would never have included Mr. Cotton and his children in the benefits of his will, the exclusion of them *is not the result* or fruit of insane delusion.

It would be as well to argue that a man could not provide for his family by will, because he was under an insane as to a total stranger, which delusion had no effect on the provisions of the will.

It is well settled that an insane delusion does not affect testamentary capacity, unless the will is the result of such delusion.

The question presented in the 18th and 19th charges is, not whether a will, *the result of partial insanity*, *is* void for want of testamentary capacity, but whether the will, which *is the result of the exercise of reason, memory and judgment* is to be set aside, because the testator was under an insane delusion as to some persons in whose favor *he might have made testamentary* dispositions, if his mind had not been deluded *as to them*.

The legal proposition on which these charges are attacked, is the same that was asserted by Lord Brougham before the privy council in *Warring v. Warring*, 6 Moore, P. C. Cases, 349, cited in note to 1 Redfield on Wills, 8, 11, pp. 80, 81, viz : " That any person laboring under delusion, or monomaniacal to any extent or upon any subject, is not to be regarded as competent to execute a will." This doctrine has not been followed in England or in America.

In *Florey v. Florey*, 24 Ala. 241, this doctrine is exploded by the express ruling of the court, that partial insanity does not destroy testamentary capacity, but only affects it when the will is shown to be the result of such insanity.

26

The burthen of proof is on the contestant to show that the will is the direct fruit or result of the delusion. In *Drew v. Clark*, 1 Add. 279 and 3 Add. 79, (the case most relied on by the appellants,) Sir John Nicholl says, "He (the contestant) must be apprised however, as well, that, the burthen of proof rests with her, as that this burthen, in my judgment, is, from the very nature of the case, a pretty heavy one."

There is so much doubt attending every case of partial insanity, as to the fact of insanity, and its extent, and the nature and scope of its influence over the other unaffected organs, and mental powers, that much hesitancy has characterized the action of the judges in all cases in applying the law ; a rigid strictness has guarded the language of judges and text writers on this subject. They generally adopt this language, that a will is regarded invalid, "when it appears that the will is the DIRECT OFFSPRING of the partial insanity or monomania under which the testator was laboring."—Redfield on Wills, vol. 1, pp. 78, 79 ; *Boyd v. Ely*, 8 Wall 71.

If we adopt the converse proposition that a will is invalid that is the indirect offspring of insane delusion, we go on a sea of uncertainty, and find ourselves compelled to anchor on the false ground stated by Lord Brougham in *Warring v. Warring, supra.* What is *in the will* must be the result *(direct)* of. insanity, and not what is omitted from it. No man can say what another man would have included in his will, if he had been sane ; as in this case, no one can say, that if Mr. Curtis had loved Mr. Cotton as intensely as he in fact hated him, he would have altered the wise, just and well considered provision of his will, so as to include Mr. Cotton's children, when they and the Babcock children were all of his posterity, who had a nearer relation to provide for them.

In cases where the positive provision of the will are broken down because they were the direct offspring of insane delusion as to a person excluded, that person has always been the nearest relative of the testator, one who had peculiar claims on his benevolence ; a person so singularly prominent as the natural object of the testator's

affection and bounty, that the exclusion of such person requires the judge to enquire what could have led to such a result. This was the case of *Drew v. Clark.* No one standing in a natural relation to the testator which renders him less conspicuous as a just claimant on his bounty can make the question.

If Mr. Curtis had an insane delusion as to Mr. Cotton, *and this did not at all effect the provisions in favor of the children of Darius Curtis, which were made in the exercise of sound reason and judgment,* the will is certainly good as to such provisions. If, by reason of this insane delusion, *he failed to make* provision for Mr. Cotton's children, it does not follow that the will, as made, was the direct result of an insane delusion. It must first appear that he would have made provision for these children *if he had been free from* this delusion. This does not appear, but the evidence establishes the reverse of this proposition. It shows that Mr. Curtis never intended to provide for Mr. Cotton or his children. This point was left open in *Florey v. Florey*, 24 Ala. 241. Mr. Cotton's children cannot take from Darius Curtis' children a benefit or advantage lawfully acquired by them, because Mr. Curtis withheld from them a provision of some sort, *which could not be the same* that was made for Darius' children.

In *Florey v. Florey*, the will was held bad, if it was " the offspring and result" of insane delusion. The insane delusion that avoids a will or bequest, must show its fruit in the terms of the will, and it must appear affirmatively by proof, or by a presumption of fact, that the will was made in the form it was, because of such delusion.

Delusion in the sense the word bears in this connection, is not undue or unjust prejudice simply ; it is the insane belief of a fact that does not exist. The 18th and 19th charges, taken in connection with the evidence, could not have misled the jury. It makes no difference if Mr. Curtis had a monomania in reference to Mr. Cotton ; that fact could not disqualify him to make a will, based on reason and sound judgment for the benefit of those who most needed and deserved his bounty.

In support of the other charges given by the probate

judge, we cite *Blakey v. Blakey's Heirs,* 33 Ala. 611, and the cases therein cited ; *Stubbs v. Houston,* 33 Ala. 555 ; *Hall v. Hall's Exr's,* 38 Ala. 131 ; 1 Redfield on Wills, title " Senile Insanity."

PECK, C. J.—The only questions argued by the counsel arise on the charges of court, and of these, we shall confine ourselves to the consideration of the 18th and 19th charges, as these are the only ones in which we are able to discover any errors. The 18th charge is in the following words, ·to-wit : " Unless the jury believe from the evidence, that William Curtis, if of sound mind, would have included Mr. Cotton or his children in the benefit of his will, they cannot set the will aside, because he may have excluded them, under an insane delusion as to Mr. Cotton ; and if Mr. Curtis, when sane, was greatly incensed towards Mr. Cotton, and if he indicated his determination not to allow him to inherit his estate, this is proper evidence to be considered along with the other facts in the case, as to whether he excluded the children, for this cause, and not because he was partially insane as to him."

This charge is somewhat involved, and is, by no means clear and perspicuous, and may, very readily, have embarrassed and mislead the jury ; but its fatal fault or error is, that it announces an erroneous legal proposition, in this, that a will is valid, although the testator at the time it was made, may have been under a particular insane delusion, and by reason of such insane delusion, a person entitled, in case of intestacy, as an heir-at-law, to inherit the estate of the testator, or a portion of it, is excluded from any benefit under the will, unless the jury should believe, from the evidence, the testator, if of sound mind, would have included such person in the benefits of his will.

In other words, a will may be upheld, although the direct offspring of a particular insane delusion, if the jury believe the testator would have made the same will, if he had been sane.   Such a proposition, we think, cannot be maintained either on reason or authority.   Mr. Shelford, in his work on the law of Lunatics, par. 37, says, " the existence of insanity is a fact, which, by the law of England, is not in

general decided without the intervention of a jury, whose decision, in such cases, ought to be founded on clear and unexceptionable evidence submitted to their consideration"—that " reason, being the common gift to man, raises the general presumption, that every man is in a state of sanity, and that insanity ought to be proved; and in favor of liberty and of that dominion which, by the law of nature, men are entitled to exercise over their own persons and properties. It is a presumption of the law of England, that every person who has attained the usual age of discretion, is of sound mind, until the contrary is proved." And again, on page 389, speaking of wills impeached on the ground of the partial insanity of testators, he says: " Proof of the existence of *partial insanity* will invalidate contracts generally, and will be sufficient to defeat a will, the direct offspring of partial insanity, both in the courts of common law, and in the ecclesiastical courts, although the testator, at the time of making it was sane in other respects, upon ordinary subjects." The reason of this rule is, because a will thus made, is an insane act—that is, the act of an insane man, and the law will not sanction nor uphold such an act. We understand this to be the principle decided in the case of *Florey v. Florey*, 24 Ala. 241. There the testator, under the insane delusion that a certain person was his son, made him the principal beneficiary of his will. The court held the will invalid, for that reason. But in this case, the jury were charged they might sustain the will, although they believed the testator excluded the contestants from all the benefits of his will, notwithstanding the testator in doing this, was acting under an insane delusion, provided they also believed the testator would not have included them, if he had been sane.

On the hypothesis of the charge, in this case, the testator made his will under the influence of an insane delusion, and we are unable to find any good reason why the will should be held invalid in the one case, and valid in th' other. In each case, the testator acted under an ir' delusion, therefore, in each case, the will should b' be invalid. In the one case, as in the other, ˻ ascertained the will was the offspring and fr'˙

delusion, it should be declared void, without inquiring what the testator would or would not have done, if he had been of sound mind and memory. Such an inquiry was not pertinent to the issue, and might distract and mislead the jury. For the foregoing reasons, the charge is erroneous, and should have been refused.

The 19th charge is in the following words, to-wit : "If William Curtis knew or believed, that the result of his dying without a will, would be to leave the children of Darius Curtis without any support out of his estate, because their father had received advancements from him in negro property equal to, or greater than, his share in the value of his estate, at the time he made his will, and if he made his will to provide for said children, and to prevent them from being left so unprotected or unprovided for, and if he did this in the exercise of his reason, these provisions of his will are lawful, and the will containing them, will be upheld, although he may have had an insane delusion as to Mr. Cotton, by reason of which, he failed to make any provision for his children in said will."

This charge, if it were not for the last clause of it, would be unexceptionable, but with it, it should have been refused, for reasons stated in disposing of the objections to the 18th charge.

We have carefully examined the evidence set out in the bill of exceptions, and as it proves a very strong dislike to, and bitter feelings, on Curtis' part, towards Mr. Cotton, the father of contestants, and tends, in some sort, to shew an insane delusion, and, that this delusion was the reason why the contestants were excluded from any benefits in the testator's will, therefore, it was proper to leave this question to the determination of the jury, under appropriate charges of the court.

For the error in giving the 18th and 19th charges to the jury, the order and decree of the probate court are reversed, and the cause remanded for further proceedings, at the cost of the appellee.