1. WILLS—TESTAMENTARY CAPACITY—INSANE DELUSIONS.

> Testatrix devised all her estate to strangers, without making provision for her husband, though her estate was the result of his savings, and they had been married for more than 50 years.  There was evidence that, when testatrix made her will, she was suffering from paranoia—a progressive and incurable form of insanity, evidenced by unfounded delusions as to particular matters.  Testatrix's husband not only did not contest the will, but even gave assistance to the proponent; and there was sufficient proof by competent experts of the existence of an insane delusion, and that it operated in making the will.  *Held*, that probate would be refused, though the contest was made, not by the disinherited husband, but by a collateral relative.

Proceedings upon the probate of the last will of Catharine Long, deceased.  Probate denied.

George V. Brower, for proponent.
Eugene V. Brewster, for contestant.
Moses J. Harris, special guardian.

CHURCH, S.  The deceased was a woman of about 70 years of age.  She executed a will in October, 1900, by which she gave about one-half of her property to a son of an adopted child, and the balance for various charitable purposes.  Her husband, to whom she had been married for over 50 years, was not mentioned in the will; nor did any of her collateral relatives receive any benefit under the same whatever.

On the part of the contestant it was shown that for quite a period of time previous to October, 1900, when the will was executed, the physician who had been attending her had pronounced her suffering with a species of insanity known as "paranoia."  He described this form of insanity as being incurable and slowly progressive, and that the main features of it consisted of delusions with regard to certain specific

matters, but that as to all other matters the mind was perfectly normal and sane. In the case of the decedent the paranoia consisted principally of certain delusions in regard to her husband, namely, that he was guilty of marital infidelity, and also was an habitual drunkard. This doctor states that, in his judgment, she was incapable of appreciating the objects of her bounty, or understanding their rights and her obligations toward them, and that she was incapable of properly attending to her property. He further testified that he had advised that she be sent to a sanitarium, which was in the nature of an insane asylum, and that he had consulted with Dr. Macumber, an expert on such matters, who, after a careful examination, had coincided in his judgment, and advised the husband of this deceased to have her sent to a sanitarium. In June preceding the execution of this will, the deceased started for Boston, and was found by the police of that city wandering in the streets, incapable of telling who she was or where she belonged. She was finally brought to relatives in Boston, whom she was unable to recognize, and by them brought home. The doctor who examined her in Boston testified that she was apparently suffering from dementia, and the description of her various acts in Boston, and on her way back to Brooklyn, shows that she was absolutely bereft of her senses, and had no intelligent idea of what she was doing at the time. The reasons which actuated her trip to Boston have never been satisfactorily explained, and the most that she, after the violent effects of her passion had passed away, could say, was that she had got lost.

What is somewhat remarkable in regard to this contest is that, notwithstanding that the husband has been excluded by the will from any participation in his wife's estate, and although it appears to be conceded that such estate was the result of the savings of his money, nevertheless he does not contest the will, but practically appears before me in the attitude of the proponent of the will. He has been daily in attendance, sitting by the side of the counsel for the proponent in the courtroom, and advising and consulting with counsel for the proponent, as if he were the proponent; and, further, he takes the witness stand as the principal witness for the proponent, to testify in regard to the condition of the deceased.

The evidence as to the general condition of this woman is extremely scanty. It appears that she did her ordinary housework. This, of course, she might do, and still not be capable of properly making a will, as it is a well-known fact that some persons who are hopelessly insane are capable of exercising considerable skill and dexterity in various acts of manual labor.

The testimony of a plumber and grocer is introduced to show that her business transactions with them were rational. The grocer's evidence showed that she simply purchased her ordinary groceries. That his observation of her was very slight is shown by the fact that he had never even noticed that she was in the slightest degree deaf, when it seems to be conceded by everybody on both sides who knew anything about her that she was inclined to deafness. The testimony of the plumber, Garry, is equally inconclusive. The testimony of Mr. Breaznell, who drew the will, is that the deceased seemed thoroughly to understand how

she desired to make her will, and went over the provisions thereof with him rather particularly. The evidence of the priest is that this woman showed him a draft of her proposed will, and consulted with him in regard to the same. But this evidence is subject to the same defect as Breaznell's, viz., that, as the mind of this deceased was not generally deranged or broken down, she might, to a casual observer, act perfectly rational, and yet be subject to paranoia.

The trivial importance of outside witnesses of this character is very well stated in the case of American Seamen's Friends' Society v. Hopper, 33 N. Y. 619, at page 631, where the court says:

"Where the mental disorder is a delusion upon one or a few particular subjects, the testimony of persons with whom he has not had occasion to speak on those subjects is of no weight. The considerable number of shopkeepers, mechanics, and retail dealers who have been called upon to pronounce upon his capacity have not appeared to me to overcome in any appreciable degree the testimony on the other side which I have adverted to."

This evidence introduced by the proponent as to the competency of the testatrix, in my opinion, should not be given any great weight, particularly in view of the fact that the physician who had carefully examined the testatrix expressly explained that the form of insanity with which she was suffering would not be apparent to the ordinary observer, but that she might conduct herself in many of the affairs of life in a perfectly rational manner, and that it was only by the examination of experts that her condition could be determined.

The proponent has introduced the testimony of Dr. McGoldrick, who examined the testatrix shortly after the time that she was pronounced insane by Drs. Bodkin and Macumber. He states that he does not think that she was generally insane, but that she had delusional insanity, confined to the specific delusions in regard to her husband. Dr. O'Connell, who, by reason of his many years' experience in treating and caring for the insane, is a high authority upon the subject of insanity, has been introduced by the proponent to explain the characteristics of paranoia and dementia; and it is his belief that, as this woman had inflammation of the kidneys, the attack while she was at Boston was the result of a temporary acute attack of Bright's disease, rather than of any general dementia. His description of paranoia coincides with and corroborates the evidence of Dr. Bodkin as to the testamentary capacity of the deceased. He can, of course, give only his opinion from the facts submitted to him.

But the real question here is, simply, did the deceased have testamentary capacity? In deciding that question, it is not necessary to decide from which specific form of insanity or delusion the deceased was suffering, or the cause of the same. The opinion of these two doctors that this woman was insane, and incapable of bringing to the making of a will the memory which the law requires, is not a mere theory advanced by experts who never met the patient, but, on the contrary, is a deliberate opinion, formed after a careful personal examination made for the purpose of best protecting her, and quite regardless of the question of her mere ability to make a will. It therefore follows that, as the deceased was not possessed of sufficient and disposing mind and mem-

ory, the paper offered for probate as her last will and testament should be rejected.

While I have thus decided, on the evidence as a whole, that this woman did not possess sufficient ability to execute the will in question, yet, if we disregard the contestant's evidence, the proponent's evidence itself shows conclusively that the will offered for probate should be rejected. The courts have always recognized the distinction between a mistaken belief, founded upon very slight facts, and an insane delusion, absolutely baseless, and have held that a mere mistake of fact, or a belief founded upon insufficient or very slight evidence, does not justify the rejection of a will. Clapp v. Fullerton, 34 N. Y. 190, 90 Am. Dec. 681; Coit v. Patchen, 77 N. Y. 533. This distinction was recognized by me in the case of the Thomas will, which I admitted to probate. But where there is an insane delusion which operated upon the mind of the testator in making the will in question, then the will should be set aside. The proponent's evidence here was not directed to showing that the decedent was acting under a mistaken belief, or that she was of an unusually jealous disposition, but, on the contrary, the proponent's principal witness (the husband of this deceased) testified that she had these wholly unfounded hobbies and delusions. The physician called by the proponent had been retained to make a careful examination of the deceased after she had been pronounced insane by the other two doctors. He stated that she was suffering from hallucinations or delusions in regard to her husband—one, that he was an habitual drunkard; and the other, that he was guilty of marital infidelity. When asked what he named her disease, he replied, "I named it 'delusional insanity.'" These were not reluctant admissions made by him on cross-examination, but such was his evidence in chief in response to question by counsel for the proponent.

A consideration of the decisions of the court regarding this subject of delusional insanity is instructive.

In the early days in England, if it appeared that a person was suffering from any hallucination or delusion, whether it related in any way to any testamentary act or not, it was sufficient to justify the courts in refusing to admit his will to probate. That rule seems to have been subsequently modified, and the correct doctrine is stated in Schouler on Wills (3d Ed.) § 159:

"The notion to which Lord Brougham gave currency—that a single delusion lurking in a testator's mind vitiates his will, though not apparent in the will itself because it proves him insane—is pointedly condemned by eminent judges in various states; and the point of inquiry upon which testamentary cases of this character invariably turn is whether the insane delusion, the monomania, entered into the product of the particular will in dispute."

This opinion is sustained by the following authorities: Pidcock v. Potter, 68 Pa. 342, 8 Am. Rep. 181; Benoist v. Murrin, 58 Mo. 307; Boardman v. Woodman, 47 N. H. 120. And in Jessup's Surrogate's Practice (2d Ed.) p. 444, it is stated that in a matter of this kind two facts must be shown, namely: (1) The existence of an insane delusion; (2) that such insane delusion operated in making the particular will in question. The chief witness for the proponent has admitted the in-

sane delusion, and the will itself shows that it was made in obedience
to it, by not giving the person concerning whom she had the insane de-
lusion one single penny.

It follows, therefore, that if this husband had contested the will, and
shown the above facts, the court would have necessarily rejected the
same. But this case is remarkable from the fact that the contest is
made, not by the person who was disinherited, but by a collateral rela-
tive, toward whom it is not shown that there was any particular mani-
festation of feeling on the part of the deceased, one way or the other;
and the question is, therefore, can such person maintain the contest
with like effect? As the contest is always made by the party disinherit-
ed, I am unable to find any case similar to this. It seems to me that,
if the will is the product of an insane delusion, it makes no difference
who is present in the contest, or who brings that fact to the attention
of the court. If this husband had contested, and had set this will aside,
the collateral relatives would have received precisely the same benefit
as though it were they who contested it. The law, in holding a will
invalid, does not attempt to declare it so only as to the particular con-
testant, but sets aside the will in toto, and leaves the property to be dis-
tributed in accordance with the statutes of descent and distribution.
By Code, § 2622, the surrogate is required, even if there is no contest,
to "inquire particularly into all the facts"; showing an intention
to only admit a will of a perfectly sane person to probate. To permit
any other rule would be for the courts to concede that the testamentary
capacity of a testator turns upon the question of who raises the issue
in court, instead of upon the actual soundness of mind of the testator.
Upon this point the reasoning of the court in the case of Cotton v.
Ulmer, 45 Ala. 378, 6 Am. Rep. 703, is instructive. That case was an
appeal from the verdict of a jury in a probate contest, in which the
judge, in a somewhat involved charge, had stated that if the testator,
at the time of making the will, was under a particular insane delusion,
nevertheless, if the jury believed that the testator, if of sound mind,
would have made substantially the same will, such delusion need not be
considered. In discussing this question the appellate court stated as
follows (page 397, 45 Ala., page 703, 6 Am. Rep.):

"We are unable to find any good reason why the will should be held invalid
in the one case, and valid in the other. In each case the testator acted under
an insane delusion. Therefore in each case the will should be held to be in-
valid."

In the leading case in this state (American Seamen's Friends' So-
ciety v. Hopper, 33 N. Y. 619), in speaking of an insane delusion, the
court states as follows (page 624):

"Delusion, in that sense, is insanity. Such a person is essentially mad or
insane on those subjects, though on other subjects he may reason, act, and
speak like a sensible man."

If this testatrix was, therefore, essentially mad in respect of one of
the objects of her bounty, her will should not be admitted to probate, no
matter who in particular does or does not contest the same, because it
stands to reason that madness pervades her entire testamentary acts.

Counsel for the proponent, however, seeks to avoid this conclusion by conceding that while, if this contest had been made by the husband, the will would have been set aside, yet, as it appears in the case that he was omitted from the will, not in consequence of the effect of this insane delusion on the testator's mind, but in consequence of a specific bequest by the deceased, the will must be upheld. But it seems to me that this argument is faulty, for two reasons: First, the facts do not substantiate the contention of proponent; second, if a person is insane, and a will is made in pursuance of such insanity, the courts will not speculate as to whether it was from some insane act or some other act, nor will they speculate, as stated in the Alabama case, as to what the testator would have done if sane.

First. Mr. Breaznell, who drew the will, states that the testatrix wanted to leave her husband a life estate in one of her houses; but the evidence is that she owned several houses, and the husband, by his right of curtesy, was entitled to a life estate in all of them; showing that even such provision would not have been a complete recognition of her husband, and would not have prevented his contesting the probate.

Second. As stated heretofore, all that is necessary for the contestant is to establish the insane delusion on the part of the decedent, and the will made in pursuance of it. When that is done it is established, as stated in American Seamen's Friends' Society v. Hopper, that the person is essentially insane. If that is so, then any request or suggestion made by the decedent as to the disposition of his property is tainted with insanity, and cannot be considered or viewed as the act of a rational mind. And, as stated in Cotton v. Ulmer, supra, the will, being the product of an insane mind, must be held invalid, and the courts cannot speculate as to whether or not the testator would have made the same will if sane, or whether such will is the result of suggestions other than an insane delusion.

The reasoning in Re Bartholick's Will, 144 N. Y. 166, 36 N. E. 1, is peculiarly applicable to the present situation. In that case the will had been set aside by a jury on the contest by the heirs. Later it was contended that the will was not vacated as to the personalty, and the next of kin objected to the surrogate setting aside the will in toto; but the court held that, the will having been declared invalid, it was immaterial if the person who had procured such a decree was interested in the personalty or not; that it would be folly to hold that it was a valid will as to personalty, and invalid as to realty. If this reasoning is sound, then it is applicable to the proposition that a will cannot be held valid as to one next of kin, and invalid as to another, but that it must be either valid as to all or invalid as to all.

As, under any aspect of the case, the deceased did not possess testamentary capacity, the paper offered should be refused probate. Probate denied.