Rollins, S.
This decedent, an unmarried woman, died in the city of New York on November 27, 1884, at the age of 57 years. A paper purporting to be her last will and testament was soon afterwards propounded in this court. Its admission to probate has been strenuously opposed by John L. Gross, her brother, and by her two sisters, Marie L. Van Woert and Rachel B. March. These three persons constituted at her death, and still constitute, her only next of kin.
The disputed paper does not include them, or any one of them, in its list of beneficiaries. It gives $20,000 to a cousin of the decedent residing in Paris, France and $5,000 to each of two other French cousins. It gives to five specified benevolent or reh'giou ' ocieties sums amounting in all to $7,000. It gives $5,000 to John L. Moore, who is named as executor, and makes him sole residuary legatee.
The other bequests are as follows:
To Rev. Dr. John Hall, minister of the Fifth Avenue Presbyterian church, whom Miss Gross characterizes as her “beloved pastor,” $5,000;
To Dr. Leroy M. Yale, to whom she refers as “my faithful friend and medical adviser,” $1,000;
To William L. Moore and James A. Moore, her “friends,” $2,000 each;
*740 To Ellen M. Johnson, who had acted for about three years as her seamstress, $250;
To Elizabeth Bush, a colored woman, who testified that she had sewed for Miss Gross at intervals “since seven years before the riot,” $1,000;
To Sarah B. Courtney, formerly a housemaid in her employ, $1,000.
To Carolina Syoberg, to whom she refers as “my maidservant, who for many years has been my constant and faithful friend, $12,000, and a quantity of clothing whose value is not disclosed.
First. The contestants’ objection that in the formal execution of this instrument there was a failure to comply with the requirements of law has not been pressed by their counsel. The evidence upon this question is so clearly in favor of the proponent that I think it unnecessary to discuss it.
The objection must be overruled.
Second. Was Harriet Gross possessed of testable capacity when she executed the paper here in controversy, or, on the other hand, is it true, as the contestants insist, that in ignoring their claim to partake of her testamentary bounty, she was governed by an insane delusion that that claim had been forfeited by their unworthy conduct towards herself ?
From the date of her birth up to the year 1875, the decedent was a member of a household which for many years prior to 1870 had consisted of her father, her mother, her unmarried sister Charlotte and herself, and had been dwelling at No. 109 East Seventeenth street, in this city. It was there that her father died in 1870, her mother in 1872, and Charlotte in 1875. Within a year after the death of the latter, Harriet moved away from the homestead, and for the remainder of her life she resided either in some hotel or in some private lodging-house, at or near New York.
The precise nature of the relations between herself and these contestants in the lifetime of their parents, and sub sequently in the lifetime of their sister Charlotte, is not disclosed by the evidence. But it is entirely clear that after Charlotte died there subsisted at all times a most plentiful lack of harmony.
John was one of the executors of his father’s will, and the interests of Charlotte and Harriet thereunder were held by him uninterruptedly until Charlotte’s death. Indeed, he continued in possession and control of Harriet’s share until March, 1877, when he surrendered it, pursuant to her demand, to Mr. John C. Shaw, as her attorney.
*741 It is claimed by the contestants that this demand was unreasonable and that there were no solid grounds for the decedent’s dissatisfaction with her brother’s management of her affairs.
It appears, however that although the sums he had paid out on her account up to the time of his dismissal exceeded slightly, if at all, the income of the funds which he had been holding as her agent, he had charged her—it would seem, without very just cause—with extravagance, and had on some occasions put her to inconvenience by delay in honoring her requests for money required for the defrayment of her current expenses.
There was another circumstance that probably had great weight with the decedent in inducing her to dispense with her brother’s services.
Before she had retired, in April, 1876, from the house in Seventeenth street where she had so long resided, a portion of the furniture and household goods which that house contained had been sold at auction and the proceeds had come to the hands of her brother John. The remaining portion, together with a quantity of wearing apparel, jewelry and personal ornaments were sent away to storehouses, where, without her knowledge, they were deposited in the name of John L. Gross, administrator, he having theretofore taken letters of administration upon the estate of his sister Charlotte.
These articles were of no great value, but they proves to be a prolific source of family discord and dissention. Some of them Harriet claimed as hers by actual purchase, others as gifts from her father or her mother or Charlotte, and others still as obtained by herself and Charlotte in common, and with a mutual understanding that when either should die the property should belong to the survivor.
Soon after Charlotte’s death John became possessed, as her administrator, of a certain bond for $2,500, which Harriet insisted was a gift from her deceased sister to herself.
In the inventory of Charlotte’s estate filed in January, 1876, and in an account filed in January, 1877, John recognized the existence of these claims without either acknowledging or disputing their validity. To this account Harriet filed objections. The issues were referred to an auditor on January 29, 1877, and there ensued before him a long and animated controversy. At some time prior to April 5,1873, he made a report which sustained Harriet’s right to a part of the property in dispute, but held that as to other parts her claim was untenable. Certain articles were found to be hers exclusively; certain others to be assets of her sister’s *742 estate; others still to be the common property of that estate and herself. On April 5, 1878, a decree was entered con firming this report and directing a division in accordance with its terms.
For at least a year before that decree was entered, friendly intercourse between Harriet and the contestants had utterly ceased. Like herself, they were all living in the city of New York, but she had paid no one of them a visit, and no one of them had visited her or had made any attempt to do so; which of the four was most at fault for this unhappy state of affairs I shall not undertake to determine.
Within three weeks after the entry of the decree above referred to, the decedent was advised by Wetmore and Bowne, attorneys for the administrator of Charlotte’s estate, that the assets of that estate were about to be distributed and that her own share therein was $15,000 or $16,000.
That this money might not be lodged in the hands of her brother John, for whom she had long entertained both distrust and aversion, she gave to Mr. William L. Moore her power of attorney for its collection. She gave him also an other power of attorney that he might obtain possession of such of her property as was then held by Mr. Shaw
On April 24,1868, Mr. Moore visited the office of Wetmore and Bowne, and, in the presence of John Gross, made a demand for the moneys due this decedent. His demand was rejected. A similar application which he made to Mr Shaw was equally unsuccessful though for a different cause. A postponement of the transfer was agreed upon between those gentlemen, and before the demand was renewed Mr. Shaw had been served with an injunction restraining him from parting with any funds in his hands belonging to Harriet Gross.
That injunction had been procured in aid of a proceeding instituted by the contestants, John L. Gross, Rachel B. March and Marie L. Van Woert, for the issuance of a commission to make inquiry regarding the competency of their sister Harriet to manage herself and her affairs.
Their petition set forth among other things that “ for the space t)f six months last past” {i. e., next preceding April 29, 1878, the day the petition bears date), the decedent had been ' a 'person of unsound mind,” and that “her actings and doings ” had been “those of an insane person.”
The commission prayed for was appointed. Early in June, 1878, a motion was made for its supersession and for the dis • missal of the petition upon which it was granted. At the hearing of this motion numerous affidavits were submitted in its support. These affidavits tended strongly to show that the allegations of the petition were without foundation. The affiants were the decedent herself, several of her lay *743 friends and acquaintances, and, as expert observers of her mental condition, Dr. Lewis A Sayre, Dr. Leroy M. Yale, Dr. Meredith Clymer and Dr. Robert. Taylor On the 18th day of July, 1878, Mr, Justice Potter granted the decedent’s motion and an order was thereupon entered superseding the commission and vacating all stays and injunctions which had hampered her control of her property and estate.
The disputes over the furniture, jewelry and wearing apparel long survived the entry of the decree of April 5, 1878. On December eighth of that year Harriet com menced, in the supreme court, an action against her brother for the conversion of divers articles to which that decree did not, as she claimed, relate. This action was referred on the 10th of June, 1880. A year later the defendant’s attorney offered to allow judgment to be taken against him for about seventy-five of the articles specified in the decedent’s complaint at prices aggregating about $450, with costs in her favor amounting to about $200. This offer was accepted by her attorney
Meanwhile, on December 14, 1878, this decedent had applied to the surrogate for an order directing the sale of the articles covered by his decree of April, 1876. Her application led to the entry on February 15, 1879, of an order appointing two referees who were directed to appraise, assort and distribute the property in dispute.
Then followed a second controversy longer and more vexatious than the first, and more discreditable to all the-parties litigant. Harriet struggled to maintain her claim to individual ownership of the disputed property and her brothers and sisters were united in their opposition.
The report of the referees was filed on January 27, 1880. It was more favorable to the decedent than the report previously submitted, and on February 10, 1880, the contestants filed numerous objections to its confirmation. Those objections were overruled by a decree signed by the surrogate on June 16, 1880
I have referred to these litigations in so much detail that I shall not stop to specify numerous others in which the decedent was engaged on the one side, and one or more of the contestants on the other. They must all be taken into serious account in considering the sentiments which pro - bably actuated the decedent when she addressed herself to the preparation of her will, and in considering the claim of the contestants that her conduct towards them is inexplicable upon any theory consistent with her sanity.
In the spring of 1878, while some of these lawsuit were in progress, Harriet sent a long, rambling, virulent letter to Mrs. March, and another, longer, more rambling and more virulent to Mrs. Van Woert.
*744 • These letters are very extraordinary productions. They were written piecemeal between the latter part of December, 1877, and the latter part of March, 1878.
Their leisurely composition was due, according to the testimony, partly to the fact that rheumatism in her fingers made the task of writing difficult and painful to the decedent, and partly to her determination to say her say to the full.
When these letters, which constituted the chief property of the petitioners in the lunacy proceeding, first fell under my eye they produced a decided impression in favor of the contestants. They seemed to be a farrago of sheer nonsense from beginning to end. I could scarcely doubt that they were the emanations of a disordered intellect. But when Mrs. [March and Mrs. Van Woert were examined as witnessess, it appeared that, to their minds, the contents of the-letters were quite intelligible; that some of the various; incidents to which they allude had actually occurred, and that as to others, it was easy to see how the decedent might have believed them to have occurred without impeachment of lunacy.
Counsel for the proponent, in his summing up of this cause, reviewed these letters sentence by sentence in the light of the evidence, and succeeded in the main in giving a reasonable explanation to their seemingly mysterious contents.
■ They are illiterate in the extreme. The writer’s spelling is far from correct, and the frequency of her resort to underscoring phenomenal; she employs capital letters with much greater frequency than correct usage sanctions, and if the punctuation marks had been distributed at random they would very likely have fallen into more suitable places than the places which they now occupy.
But it is not shown that the decedent ever spelled better, ever punctuated more accurately, or was ever more sparing in her use of capitals and italics than on the days she was employed in writing the letters now under consideration; and it is not pretended that, prior, to the death of her father, she showed any indications of mental derangement..
Upon a review of the mass of 'evidence taken at this trial I cannot •doubt, that long before she executed the paper here in dispute, Harriet Gross had become fully convinced that her brother John had been guilty of unfraternal, unfair and dishonest conduct, and that in siding with him-against herself, and for divers other causes her sisters had merited her just indignation.
She evidently supposed herself entitled to all the property left in the Seventeenth- street house at Charlotte’s death which afterwards became the subject of controversy, and *745 though, as regards a portion of that property, she had no claim which she could enforce in the courts, I cannot find that her belief to the contrary was extravagant or absurd.
While I am not justified in asserting that there was in fact a definite understanding between herself and Charlotte that the articles of household furniture and of personal adornment which were the exclusive property of one or the other, or were owned by the two in common, should, at the death of either, become the absolute property^ of the survivor, the existence.of such an understanding is quite consistent with all the testimony, and would explain in great measure why the decedent was so greatly incensed against her brother and sisters for insisting upon the maintenance of their strict legal rights, and disregarding what she may have honestly deemed their obligation in honesty and conscience to recognize her claim.
If it be assumed that while entrusted with the management of his father’s estate, the estate of his sister Charlotte and the property of this decedent, the contestant John Gross acted at all times with most scrupulous fidelity to the decedent’s interests, and that during all that period, his sisters Eachel and Marie treated her as well as she deserved to be treated, or even better than her conduct merited; it by no means follows that her conviction that she had been cheated by her brother and ill-used by her sisters was an insane delusion.
Her sentiments in that regard were constant and deep-rooted. They were avowed on numerous occasions and to very many people with whom she was on terms of intimacy and confidence.
She seems to have been a woman of jealous and suspicious nature, excitable, contentious, obstinate, revengeful; all in all, one with whom it might very likely have proved to be no easy task for her family to maintain pleasant relations, even had they been disposed, as they apparently were not disposed, to make great sacrifices for the sake of peace and harmony.
That they should have pursued towards her the very course that they in fact pursued for the eight years preceding her death may not be altogether surprising; but I can readily see how Harriet, with her peculiar disposition and temperament, might, in the exercise of sound mental faculties, have found satisfactory reasons for all that she believed, and said, and did, in her intercourse and non-intercourse with her immediate kindred.
Even if uncharitableness, malice and revenge were the sole motives that prompted her to exclude the contestants from sharing in such estate as she should leave at her *746 death, this challenged paper must nevertheless stand, if it is the product of a sane mind and a free will.
I have neither the inclination nor the right to test its validity by the fairness, propriety or justice of its dispositions'. To apply such a test would be to subvert that absolute control over his posthumous estate which is vested in a testator by express authority of law.
The animosity which the decedent displayed towards all these contestants in the letters of March, 1878, was doubtless intensified by their subsequent efforts to have her declared insane. If, before the inception of the lunacy proceedings, Harriet believed that they had been striving to rob her of her heritage, it would have been strange indeed if that belief had not been still moré firmly established in her mind at the time she entered upon the preparation of her will.
The confirmed feeling of hostility which she then entertained for the contestants was the result of obvious and in part of very recent causes having actual existence; it was very far from being the mere offspring of a perverted imagination.
Said Denio, J.,
pronouncing the opinion of the court of appeals, in American Seamen's Friend Society v. Hopper, 33 N. Y., 619:
“The question which arises upon the evidence is this: Whether his (an alleged testator’s) conduct and declarations-were simply the manifestations of an excitable, coarse, ill-regulated and suspicious mind, or were the consequences, on the other hand, of an insane delusion which led him to believe in the existence, on the part of his wife and his relatives, of conduct and intentions such as he imputed to them. * * * On questions of testamentary capacity courts should be careful not to confound perverse opinions and unreasonable prejudices with mental alienation. These qualities of mind may exist, even in a high degree, and yet, so far as regards the view which the law takes of the case, the subject may be sane and competent to perform a legal act.”
_ The facts of the case at bar bear, in many of their essential features, a close resemblance to those upon which the court of appeals passed in Coit v. Patchen, 77 N. Y., 533.
The allegations of the contestants in that case were that Mrs. Coit, the testatrix, labored under insane delusions as to the conduct of her husband and of several other members of her family, who had instituted proceedings .for the appointment of a committee to take charge of her estate. The court said, Miller, J., pronouncing its opinion, that though the decedent’s conduct toward her husband tended to show an impairment of her mental faculties, yet in view *747 of the disclosures that they were engaged in frequent quarrels, that litigations were pending between them, etc., etc., the circumstance could not be considered as controlling. “While there is much to condemn in the conduct of all the-parties,” says the learned judge, “it does not follow that an erroneous opinion formed amid such a conflict of feeling and passion was an insane delusion. In considering this branch of the case, it must not be overlooked that the decedent was a woman of strong will, who had passed a life of strife and turmoil, who had quarrelled with her husband, had a lawsuit with him, and possessed marked peculiarities of disposition and character which might well control her conduct.”
It was claimed by the appellants in Clapp v. Fullerton (34 N. Y., 190), that the testator whose mental capacity was there upheld by the court of appeals, was under an insane delusion as to the legitimacy of his elder daughter against whom he had made marked discrimination in his will.
The court said, through Porter, J.: “To sustain the allegation it is not sufficient to show that his (the decedent’s) suspicion in this respect was not well founded. * * * The right of a testator to dispose of his estate depends neither upon the justice of his prejudices nor the soundness of his reasoning. After analyzing the circumstances under which the decedent’s mistaken belief had originated, the learned judge adds: “It should be referred to weakness and credulity rather than to insane delusion. The repose of families has often been disturbed on grounds as slight and trivial as those which misled this testator.”
The decision of Sir John Nicholl in the famous case of Dew v. Clarke (3 Adams, 79), is greatly relied upon by counsel for these contestants. The decedent whose alleged will was there the subject of controversy, though he left a fortune of about £40,000, cut off his only daughter, a woman grown, with an income of less than £100 a year. The evidence satisfied the court that this daughter was dutiful and affectionate, engaging in her manners and exemplary in her conduct and character, and that her father sincerely and vehemently believed, and that, too, without the slightest substantial basis for so believing, that she was altogether profligate and depraved. He was wont to speak of her as “a fiend”—“a monster of vice”—“a very devil incarnate”—“Satan’s special property”—and from her earliest childhood he had treated her with almost unheard of ferocity. His conduct was found to be inexplicable upon any other theory than that of an extravagant and insane delusion. It is manifest that a conclusion based *748 upon such a state of facts furnishes no just criterion for the termination of the case at bar.
It is claimed on behalf of the contestants that for several years preceding her death the decedent indulged in the use of intoxicating liquors to such an extent as to enfeeble her mental faculties, blunt her moral sense and pervert her judgment.
There is testimony tending to show that on several occasions her appearance and demeanor indicated that she was somewhat under the influence of alcoholic stimulants.
There is testimony on the other hand equally entitled to credence, to the effect that on other occasions no such indications were visible, and they are not shown to have been present at the time she planned or at the time she executed the paper here assailed.
The evidence upon this phase of the controversy, when examined in the light of the decision of the court of appeals, in Peck v. Cary (27 N. Y., 9), is found to fall far short of establishing the contestants’ claim. The decedent, whose will was there sustained, had for years before his death been a confirmed drunkard, who, as several witnesses asserted, had, within that time, scarcely ever been sober; he had been afflicted, more than once, with delirium tremens; while crazed with drink he had repeatedly sought to put an end to his existence, and his efforts had finally proved successful.
After commenting at length upon these facts, Denio, 0. J., pronouncing the opinion of the court, said: “It is not the law that a dissipated man cannot make a contract or execute a will, nor that one who has the habit of excessive indulgence in strong drink must be wholly free from its influence when performing such acts;” and he added that such acts would be valid and effectual in spite of such influence, unless performed when the actor was incapacitated by present intoxication, or unless a fixed mental disease had supervened upon his intemperate habits. To similar effect, see Gardner v. Gardner (22 Wend., 526), Handley v. Stacey (1 F. & F., 574).
It seems to me that the evidence as to this decedent’s occasional use of intoxicants has served to weaken rather than to fortify the claim that she was of unsound mind; for it is quite possible that her moods of excitement and depression may have been attributable, in part, at least, to the immediate effects of wine or spirits upon a nervous and sensitive organization. I cannot conceal my regret that the contestants should have seen fit, in bringing this matter to the attention of the court, voluntarily to supplement by their own oaths the somewhat scanty testimony furnished by other witnesses. The course which they have pursued *749 in this regard inevitably provokes the thought that Harriet may not have been entirely wrong in her belief, that, in instituting the lunacy proceedings, they were actuated solely by a desire to obtain possession of her property for their own use; and this, at least, is demonstrated, that her belief, whether well founded or erroneous, cannot justly be charged to her as an insane delusion.
Careful reflection upon all the testimony has convinced me that when this paper was executed, its maker was competent to give it validity and effect as a will.
Third. It only remains to be considered whether the instrument which I have now found to have been duly executed by a competent testatrix, does or does not embody her free, unbiased wishes as to the disposition of her estate.
The law presumes the affirmative of this proposition.
Has that presumption been overthrown ?
The mere fact that the nearest relatives of a decedent have been utterly ignored in the dispositions of a paper propounded as his will, is sometimes sufficient of itself to throw a doubt over the validity of its claims to probate.
But, for reasons already stated, that fact is quite barren of significance in the case at bar. In view of the character of the decedent as shown by the evidence, and the hostile sentiments with which she had for years regarded these contestants, the execution of a will in their favor, on November 10, 1884 (the date of the paper here challenged), would have furnished far stronger evidence of her insanity than is discoverable upon any of the 433 type-written pages which make up the record of this trial.
Given a determination on her part to divert her estate from those to whom the statutes of descent and distribution would award it in the event of her intestacy, the dispositions of this alleged will are not such as to provoke a suspicion that they were adopted either in deference to the persuasion or in obedience to the coercion of any person or persons whomsoever.
Three years previously she had signed and published a testamentary paper, differing in some respects from that which is here offered for probate, but whose establishment would benefit none of these contestants to the extent of a penny. A comparison between the two instruments fails to reveal any radical changes in the current of the decedent’s affections or in the fine of her purposes—any changes that cannot be easily explained upon theories quite consistent with the exercise, on her part, of spontaneous and untrammeled volition.
Now, it is not seriously claimed that the dispositions of either of these instruments were unlawfully controlled or influenced by any other person than the decedent’s maid, *750 Caroline Syoborg, who is named as a legatee in both. That Caroline Syoborg was unlawfully instrumental in bringing into existence the later of the two papers is extremely unlikely, in view of the fact that its operation as a revocation and annulment of the earlier would be greatly to her disadvantage.
By the will of 1881 she was appointed executrix, and was not only given a bequest of $10,000, but was also made the legatee of the wardrobe, jewelry, bric-a-brac, household furniture, clothing and ornaments of the decedent and of all her personal property, “ excepting money, bonds, stocks and mortgages.”
This was doubtless a very generous provision; and yet, iñ view of the circumstances under which it had its origin, I shall not undertake to say that it was lavish or extravagant.
In making it the decedent characterized the woman Caroline as “my devoted nurse and attendant, who has for many years been my constant and faithful friend.”
I have ransacked the evidence in vain to find that this characterization was false or that it was in the least exaggerated.
Caroline was called as a witness and was subjected to a long and searching examination, in which she displayed somewhat exceptional intelligence. If in her dealings with her mistress she had been as self-seeking and unscrupulous as the contestants claim her to have been, and had exercised the authority and control over her mistress which they insist that she did exercise, it is extremely unlikely that she would have contented herself with so small a fraction of the estate here in controversy, as will come into her possession by the establishment of this paper.
I have no doubt that its provisions in her favor were born of the attachment which her mistress felt for a loyal and attached servant. The existence of those motives to the bestowal of testamentary bounty wifi not suffice to make such bestowal illegal and invalid. Will of Hamersley, Daily Register, January 8, 1886, and cases cited.
“ It is not sufficient for the purpose of establishing undue influence,” said Earl, J., pronouncing the opinion of the court of appeals, in Marx v. McGlynn (88 N. Y., 357), “to show that the will is the result of affection or gratitude or the persuasion which a friend or relative may legitimately use; but the influence must be such as to overpower and subject the will of the testator, thus producing a disposition of property which he would not have made if left freely to act his own pleasure.”
The burden of establishing that such unlawful influence has been exercised rests upon one who alleges it.
*751 The presumption of its non-exercise has not been overthrown by these contestants.
Their objections must, therefore, be overruled, and the disputed paper must pass to probate.